**HOLT CARGO SYSTEMS, INC., et al.**

v.

**DELAWARE RIVER PORT AUTHORITY, et al.**

**No. CIV. A. 94–7778.**

United States District Court, E.D. Pennsylvania.

March 23, 1998.

Paul R Rosen, Bruce S. Marks, Jeffrey M. Goldstein, Richard J. Perr, Jonathan M. Peterson, Spector, Gadon & Rosen, P.C., Philadelphia, PA, John A Evans, Philadelphia, PA, for Plaintiffs.

Henry F. Siedzikowski, John M. Elliott, Timothy T Myers, Michael P. Walsh, Elliott, Reihner, Siedzikowsky and Egan, P.C., Blue Bell, PA, for Defendant Delaware River Port Authority.

Tracy Mooney Schaeffer, Sprague, Creamer & Sprague, Philadelphia, PA, Richard Sprague, Denise Pallante, Deborah B. Miller, Sprague & Sprague, Philadelphia, PA, Charles Hardy, Philadelphia, PA, Geoffrey C. Jarvis, Sprague and Sprague, Philadelphia, PA, for DefendantPorts of Philadelphia and Camden.

Patrick J. O'Connor, Karl L. Prior, Cozen & O'Connor, Philadelphia, PA, Richard M. Rosenbleeth, William H. Roberts, Lisa A. Rosenblatt, Francis X. Crowley, Blank Rome Comisky & McCauley, Philadelphia, PA, for Defendant Philadelphia Regional Port Authority.

Richard J. Campbell, Pepper, Hamilton & Scheetz, LLP, Philadelphia, PA, for Respondent Jose Diaz.

Jacqueline V. Guynn, Richar J. Campbell, Pepper, Hamilton & Sheetz, Ph8iladelphia, PA, for Respondents Tioga Fruit Terminal, Inc., Chilean Line, Inc.

John W. Butler, Anne E. Mickey, Sher and Blackwell, Washington, DC, for Respondent Delaware River Stevedores Inc.

Steven L. Friedman, Patrick M. Northern, Dilworth, Paxson, Kalish & Kauffman, LLP, Philadelphia, PA, for Respondent Crowley American Transport, Inc.

Alan A. Turner, Turner and McDonald, Philadelphia, PA, for Respondents Joseph Balzano, Al Castagnola, South Jersey Port Corp.

Matthew H. Alder, Jacqueline V. Guynn, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Respondent Barwil Wightman Shipping.

Richard W. Foltz, Jr., Pepper, Hamilton & Scheetz, Philadelphia, PA, for Respondent Penn Warehousing and Distribution Co.

William C. Miller, Hepburn, Willcox, Hamilton and Putnam, Philadelphia, PA, for Respondents John A. Lord, William C. Miller, Hepburn Willcox Hamilton & Putnam.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

Plaintiffs Holt Cargo Systems, Inc. ("Holt Cargo"), Holt Hauling & Warehousing, Inc. ("Holt Hauling") and Astro Holdings, Inc. ("Astro") (collectively the "plaintiffs"), alleging violations of their substantive due process and equal protection rights under 42 U.S.C. § 1983, filed this action against defendants the Delaware River Port Authority ("DRPA"), the Port of Philadelphia & Camden, Inc. ("PPC") and Philadelphia Regional Port Authority ("PRPA") (collectively the "defendants"). Defendants move for summary judgment on both counts or, in the alternative, for summary judgment on damages. For the reasons stated below, defendants' motions will be granted.

### FACTS

Plaintiffs filed their initial Complaint on December 28, 1994; they then filed an Amended Complaint. Defendants moved to dismiss the Amended Complaint. By Memorandum and Order dated April 19, 1996, the court granted the motion as to plaintiffs' admiralty claim but denied the motion as to plaintiffs' claims under § 1983. *See Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, No. 94–7778, 1996 WL 195390 (E.D.Pa. Apr. 19, 1996) ["*Holt I*"]. Certain other claims were severed and stayed pending a determination of this court's jurisdiction under federal maritime law and the Shipping Acts of 1984. The court inquired of the Federal Maritime Commission ("FMC") whether it wished to participate as *amicus curiae*. The FMC moved for leave to appear and filed a Statement of Points and Authorities. The court gave the parties leave to respond but on May 16, 1996, plaintiffs dismissed all claims before the court other than those under § 1983 and filed similar claims with the FMC. The antitrust and contract claims have been voluntarily dismissed without prejudice by the plaintiffs. Defendant PRPA's counterclaim, alleging violations of the Amended Packer Lease, was also dismissed without prejudice. The action before the FMC, assigned to Administrative Law Judge Frederick M. Dolan, Jr. ("Judge Dolan"), remains pending.

The Holt entities' FMC Complaint against defendants and non-party Pasha alleges violations of the Shipping Acts of 1984, 46 U.S.C. §§ 1701 and 1916, and 46 U.S.C. § 801. PRPA, PPC, DRPA and Pasha moved to dismiss the FMC action for lack of jurisdiction and failure to state a claim, or in the alternative for a more definite statement. Judge Dolan denied those motions without prejudice on November 25, 1996 to allow the Holt parties discovery on jurisdictional issues. Issues under the Shipping Acts are not before this court; the constitutional issues are not before the FMC.

Plaintiffs filed a Second Amended Complaint on June 16, 1996; that pleading was stricken by Order entered October 14, 1997. Plaintiffs then filed a revised Second Amended Complaint. Defendants moved to dismiss the revised Second Amended Complaint. By Memorandum and Order dated November 13, 1997, the court granted the motion as to plaintiffs' claim for violation of procedural due process, but denied the motion as to plaintiffs' claims for violation of equal protection and substantive due process. *See Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, No. 94–7778, 1997 WL 714843 (E.D.Pa. Nov. 13, 1997) ["*Holt II*"]. After more than three years of protracted and contentious discovery,[1] the undisputed facts

---

1. Discovery matters were referred to United States Magistrate Judge M. Faith Angell ("Judge Angell") by Order dated March 17, 1995. Discovery was stayed twice at the request of the parties. Between the end of October, 1997 and the end of January, 1998 the parties filed approximately twenty-five motions to compel, for sanctions, for contempt and other related discovery

and those viewed in the light most favorable to plaintiffs establish the following.

## I. Packer Avenue Marine Terminal

The Packer Avenue Marine Terminal ("Packer") is a 106 acre marine facility; it is the largest and most modern marine terminal in operation on the Delaware River. (T. Holt, Jr. Dep. at 250–51). Packer is located at the southern end of the port closest to the Atlantic Ocean. (T. Holt, Jr. Dep. at 231; Defs.' Appendix 528, 538–39, 542). Packer is adjacent to PPC's Ameriport Intermodal Yard, a transfer facility to introduce cargo onto national rail lines; this proximity reduces transfer costs. Holt Hauling has no interest in Packer.

## II. Holt Cargo & Astro

Holt Cargo, a stevedoring company owned by Thomas Holt, Sr. ("Holt, Sr."), operates in the Philadelphia and Camden Port District (the "Port District"). (T. Holt, Sr. Dep. at 23–26). Holt Cargo leased Packer from PRPA on December 30, 1990 (the "Amended Packer Lease"). (Defs.' Appendix at 1–234).

Under the Amended Packer Lease, Holt Cargo has the right to lease Packer and operate it for a ten-year period, with four ten-year renewal options, i.e., a total of fifty years. (Amended Packer Lease at §§ 2.2, 2.3). The Amended Packer Lease requires Holt Cargo to handle all new container business "which it secured for Delaware River Marine Terminal facilities" at Packer. (*Id.* at § 4.2). Holt Cargo is permitted to operate Packer as a closed facility; that is, Holt Cargo is the sole stevedore for any ships arriving at Packer. The agreement also prohibits Holt Cargo from removing the cranes located at Packer prior to termination of the lease. (*Id.* at § 7.3(b)). PRPA agreed to buy one of Holt Cargo's cranes, called the PACECO Crane; the price ultimately agreed

upon was about $5,500,000. (Defs.' Appendix at 945–46). PRPA also agreed to make capital improvements at Packer in the amount of $16,000,000. (Amended Packer Lease at Art. VII; Ex. H).

The Amended Packer Lease gives Holt Cargo the right to develop other parcels of land known as the "Additional Parcels" subject to PRPA's existing leases with third-parties. (Amended Packer Lease at § 24.2). The Additional Parcels are defined as Piers 96 South, 98 South and 100 South. The Amended Packer Lease gives Holt Cargo the exclusive right to develop the Additional Parcels, subject to existing PRPA leases, during the initial ten year term of the Holt Cargo lease, and non-exclusive development rights during the subsequent renewal terms. (*Id.*). The Amended Packer Lease permits PRPA to "disapprove any aspect" of a proposed development plan "in its sole discretion." (*Id.* at § 24.2(d)(iii)). Under the Amended Packer Lease, PRPA agrees to support applications for development permits at the Publicker Terminal ("Publicker"). (*Id.* at ¶ 26).

On June 14, 1991, Holt Cargo assigned its interests under the Amended Packer Lease to Astro (Compl. ¶¶ 6–7);[2] on the same date, Astro sub-leased part of Packer back to Holt Cargo for the amount of rent charged by PRPA, plus approximately 15%. (Amended Packer Lease at 24). Astro has subsequently sub-leased portions of Packer to additional companies, some of which are owned or controlled by Holt, Sr.

## III. Holt Hauling

Holt Hauling owns the Gloucester Terminal ("Gloucester"), a New Jersey marine terminal across the Delaware River from Packer. Gloucester competes with Packer for refrigerated cargo, steel, break bulk and con-

---

motions. There were numerous appeals from Judge Angell's rulings and one appeal from this court's ruling on the privileged nature of one document; the Order to produce that document has been stayed pending appeal. In addition, this court has ruled on at least two dozen motions *in limine* and other trial-related matters.

The documents produced in discovery resulted in an original proposal to use over 4,000 docu-

ments at trial. The documents submitted in support of and opposition to the instant motion are measured in inches (19), not pages (unknown), and the briefs alone were 100 and 200 pages for defendants and plaintiffs respectively.

**2.** All citations to the Complaint refer to the revised Second Amended Complaint.

tainer shipping. (Pltffs.' Pretrial Memo at 3).

Prior to entering into the Amended Packer Lease with PRPA in 1989, Holt Cargo provided stevedoring services at Gloucester. (T. Holt, Sr. Dep. at 39). From then until 1992, Holt Hauling operated Gloucester with International Longshoreman Association ("ILA") labor. At the end of 1992, Holt Hauling temporarily closed Gloucester until late 1993 or early 1994. Holt Hauling now leases this facility to tenants providing stevedoring, warehousing and other terminal services. (Compl.¶ 10). These tenants, some of whom are owned in whole or in part by Holt family members, operate with non-ILA labor. (W. Curran Dep. at 25–26).

Gloucester is also at the southern end of the port, closest to the Atlantic Ocean; ships berthing there do not need to navigate under the Walt Whitman or Benjamin Franklin Bridges.

## IV. DRPA

Defendant DRPA is a public corporate entity created by the Commonwealth of Pennsylvania and the State of New Jersey by interstate compact (the "Amended Compact") under the Interstate Compact Clause, U.S. Const. art. I, § 10, cl. 3. *See* Pa. Stat. Ann. tit. 36, § 3503; N.J. Stat. Ann. § 32:3–1, *et seq.* Congress and the President approved the Amended Compact on October 27, 1992. *See* 106 Stat. 3576 (1992). DRPA's purpose is to promote the Port District and eliminate intra-port competition and "churning" of cargo among companies competing in the Port District.

## V. PPC

Defendant PPC is a public corporate entity of the Commonwealth of Pennsylvania and the State of New Jersey. PPC is a subsidiary of DRPA; DRPA formed PPC under the terms of the Amended Compact in 1994. (Compl. ¶¶ 13, 35). PPC's purpose is to carry out DRPA's mission to unify the Port District and prevent harmful intra-port competition.

## VI. PRPA

Defendant PRPA is a public entity created by the Commonwealth of Pennsylvania to promote port development in southeastern Pennsylvania. PRPA owns marine terminals and other facilities in the Philadelphia region of the Port District. (Compl. ¶ 11). PRPA owns Packer, Piers 84, 86 and 96 South, 98 South and 100, the Tioga Marine Terminal and the Tioga Container Terminal. (Compl. ¶ 11). PRPA has leased some of these facilities to Holt Cargo and other third-parties.

## VII. Non-defendant Co-conspirators

Plaintiffs have named several non-defendant co-conspirators. These include: South Jersey Port Corporation ("SJPC"), a public entity of the State of New Jersey owning and operating Broadway Marine Terminal ("Broadway") and Beckett Marine Terminal ("Beckett"); PASHA Auto Warehousing, Inc. ("Pasha"), a PRPA lessee of Pier 96 South; James McDermott ("McDermott"), PRPA's executive director; Paul DeMariano ("DeMariano"), PPC's president and chief executive officer ("CEO"); Paul Drayton ("Drayton"), DRPA's executive director; and Joseph Balzano ("Balzano"), SJPC's CEO (collectively the "executive directors"). (Compl. ¶¶ 14–17).

## VIII. Unification of the Port District

In 1992, Pennsylvania and New Jersey agreed to unify the Port District to eliminate intra-port competition and "churning" of cargo and to strengthen the Port District's ability to compete against other regional ports. (Compl. ¶¶ 22, 25). Pennsylvania and New Jersey both enacted legislation (the "Unification Acts") to unify the Port District. *See* Pa.Stat.Ann. tit. 36 § 3503; N.J. Stat. Ann. § 32:3–1, *et seq.*; (Compl. ¶ 26.) Congress and the President approved the Amended Compact on October 27, 1992. *See* 106 Stat. 3576 (1992); (Compl. ¶ 26.)

Unification of the Port District was intended to place the power to maintain the Port District in DRPA and its subsidiary, PPC. (Compl. ¶ 31). Unification of the Port District was supposed to occur within two years of the Amended Compact's approval, i.e., October 27, 1994 (the "unification date"). *See*

*id.* at ¶ 32. After unification, PPC was to take over PRPA's and SJPC's functions. *See id.* at ¶ 34. The executive boards of PRPA, SJPC and DRPA approved a Term Sheet in 1994 to govern the merger of PRPA and SJPC into PPC. *See id.* at 36. Plaintiffs assert all port development activities after unification were to be conducted solely by DRPA or its subsidiary PPC.

Plaintiffs claim unification occurred *de jure* on the unification date. Alternatively, unification occurred *de facto* "because DRPA, PPC, PRPA and SJPC have joined together to control the Port District, both pursuant to the Term Sheet approved in 1994 and by joint adoption of business plans and goals by the boards and Executive Directors of DRPA, PPC, PRPA and SJPC, even though a final merger has technically not taken place." *Id.* at ¶¶ 37–38. PPC's 1994–95 Handbook states unification "became a reality in 1994." *Id.* at ¶¶ 39–40.

The Amended Compact provides that DRPA shall prepare a comprehensive master plan (the "master plan") for the development of the Port District to include "plans for construction, financing, development, reconstruction, purchase, lease, improvement and operation of any terminal, terminal facility, transportation facility or any other facility of commerce or economic development activity." Amended Compact, art. XII(7); Compl. ¶ 27.

"Prior to adopting such master plan, the commission shall give written notice to, afford a reasonable opportunity for comment, consult with and consider any recommendations from State, county and municipal government, as well as commissions, public corporations and authorities from the private sector." *Id.* If DRPA modifies or changes the master plan, it must follow these same procedures. *See id.*

When DRPA authorizes any "project or facility," it must provide the governor and legislature of both states with a "detailed report on the project." Amended Compact, art. XII(7). In those reports to the two states, DRPA "shall include therein its findings which fully set forth that the facility or facilities operated by private enterprise within the Port District and which it is intended shall be supplanted or added to are not ade-

quate." Amended Compact, art. IV(q); Compl. ¶ 28.

In 1994, DRPA, PPC, PRPA and SJPC produced a "Strategic Business Plan" providing for "a unified government agency to take over the entire Port District" by purchasing PRPA leases with private businesses so that "the private sector would not be the operator of the facilities." *Id.* at ¶¶ 41–42. PRPA sought "not only to be a lessor, but to operate its marine terminals with the aid of SJPC and in competition with Holt Cargo, Astro, and Holt Hauling." *Id.* at ¶ 45.

Holt Cargo's fifty-year amended lease, its plan to develop the Publicker Site, Pier 96 South and the additional parcels, and Holt Hauling's ownership and operation of the Gloucester Terminal "stood in the way of the hidden goal of total government ownership, operation, and control of the Port District." *Id.* at ¶ 46. PRPA informed the other defendants it had no right to condemn the property covered by the amended lease. *See id.* at ¶ 47. PRPA, SJPC, DRPA and PPC could not afford to purchase the property of the plaintiffs. *See id.* at ¶ 48.

Therefore, DRPA, PPC, PRPA and SJPC allegedly entered into a conspiracy to obtain control of the entire Port District, including the marine terminals controlled by the plaintiffs, by driving Holt Cargo, Astro and Holt Hauling from the Port District. *See id.* at ¶¶ 49, 50. DRPA, PPC, PRPA and SJPC sought to obtain the customers of Holt Cargo and Holt Hauling. *See id.* at ¶ 53.

## IX. Predatory Acts

Plaintiffs base their equal protection and substantive due process claims on the following seven alleged predatory acts by PRPA, with whom DRPA and PPC allegedly conspired: (1) PRPA agreed to join with Holt Cargo and Astro in an application for environmental permits to develop the Publicker Site and the additional parcels and then arbitrarily and in bad faith withdrew its support, (*Id.* at ¶¶ 55–60); (2) PRPA and Pasha have arbitrarily and in bad faith denied Holt Cargo and Astro rights under the Amended Packer Lease to use and develop Pier 96 South, (*Id.* at ¶¶ 61–65); (3) in October, 1994,

PRPA arbitrarily threatened to evict Holt Cargo and Astro from the Packer Avenue Terminal, although it knew Holt would have to report this eviction notice to its lenders, customers and prospective financing sources, (*Id.* at ¶¶ 66–70); (4) PRPA arbitrarily refused to honor its obligations under the Amended Packer Lease "to dredge berths, provide capital improvements, and repair property, including container cranes," and DRPA arbitrarily refused to provide funds to PRPA for dredging, (*Id.* at ¶¶ 71–75); (5) DRPA, PPC and PRPA jointly published advertisements falsely claiming to operate the Packer Avenue Terminal in order to mislead prospective customers into contacting them for business, (*Id.* at ¶¶ 76–78); (6) PRPA arbitrarily refused to lease Piers 82 and 84 to another Holt-related company planning to use Holt Cargo for stevedoring, (*Id.* at ¶¶ 79–83); and (7) PRPA and SJPC have diverted customers from Holt Cargo and Holt Hauling by offering subsidized rates, free rent and other benefits to competitors, solely to cause economic loss to Holt Cargo and Holt Hauling. (*Id.* at ¶¶ 84–86).

## DISCUSSION

### I. Standard of Review

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant moving for summary judgment bears the initial burden of demonstrating there are no facts supporting the plaintiff's claim; then the plaintiff must introduce specific, affirmative evidence there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The court must draw all justifiable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. 2505. The non-movant must present sufficient evidence to establish each element of its case for which it will bear the burden at trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rule 56(e) requires the presentation of evidence "as would be admissible" at trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548; *see, e.g., J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). The non-moving party cannot rest upon conclusory allegations and unsupported speculation. *See Medina–Munoz v. R.J. Reynolds Tobacco*, 896 F.2d 5, 8 (1st Cir.1990); *Barnes Foundation v. Township of Lower Merion*, 982 F.Supp. 970, 982 (E.D.Pa.1997).

On April 19, 1996 and again on November 13, 1997, this court denied motions to dismiss plaintiffs' claims under § 1983 that state actors violated their rights to substantive due process and equal protection. In considering a motion to dismiss, the court must accept as true all factual allegations in the complaint and all reasonable inferences drawn therefrom and view them in the light most favorable to the non-moving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). A motion to dismiss may be granted only if the court finds that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The court then held that the law accorded substantive due process protection to a lessee's property against arbitrary or irrational conduct. "Plaintiffs' allegations in the complaint, drawing all permissible inferences therefrom in plaintiff's favor, state a property interest worthy of substantive due process

protection." *Holt Cargo Sys., Inc.*, 1996 WL 195390, at *4. "As to the alleged abuse of government power, defendants argue their acts were not arbitrary or irrational; they were necessary to fulfill their legislative duty to unify the ports. As part of the port unification plan, defendants are authorized to operate terminals and exercise eminent domain power, but defendants cannot engage in a campaign of harassment and disparagement to destroy Holt's business and obviate the necessity for exercise of eminent domain. Nor can defendants conspire to reduce the value of plaintiffs' businesses to acquire plaintiffs' assets for less than their actual worth. Regardless of the presumption of legislative rationality, legislative authority to unify the ports cannot constitutionally authorize destroying a business to take property without compensation." *Id.*

■ The issue now before the court is not what plaintiffs have alleged but whether plaintiffs have produced evidence from which a jury might rationally find that defendants have actually reduced the value of plaintiffs' business and taken unlawfully what they were authorized to take lawfully with due compensation. Denial of a motion to dismiss is always without prejudice to a motion for summary judgment at the end of discovery.

■ Similarly, "[i]n order to state an equal protection claim where a statute or policy is facially neutral, plaintiffs must allege intentional discrimination, i.e., that plaintiffs are intentionally being singled out from a group of similarly situated persons." *Id.* Plaintiffs' allegation of intentionally discriminatory actions to injure their business by offering more generous lease terms to others similarly situated survived a motion to dismiss. But on a full record at the close of discovery (including three hundred pages of briefs and seven volumes of exhibits submitted by plaintiffs) the issue is not the same. Considering undisputed facts and all disputed facts as alleged by plaintiffs (if supported by any admissible evidence) without weighing credibility, the issue is whether plaintiffs have offered sufficient evidence from which a rational fact finder could find an unconstitutional denial of equal protection.

■ A genuine issue of material fact precludes summary judgment, but an issue of fact is "material" only if the dispute "might affect the outcome of suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the evidence favoring the nonmoving party is "merely colorable," "not significantly probative," or amounts to only a "scintilla," summary judgment may be granted. *See Anderson*, 477 U.S. at 249–50, 252, 106 S.Ct. 2505. Plaintiffs may not "build a case on the 'gossamer threads of whimsey, speculation and conjecture.'" *Keller v. Bluemle*, 571 F.Supp. 364, 371 (E.D.Pa.1983), *aff'd*, 735 F.2d 1349 (3d Cir.1984); *see also Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1197 (3d Cir.1995).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## II. Eleventh Amendment Immunity (PRPA)

■ The Eleventh Amendment states, in relevant part, that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. The Eleventh Amendment also bars suits against a state by its own citizens, *see Hans v. Louisiana*, 134 U.S. 1, 17, 10 S.Ct. 504, 33 L.Ed. 842 (1890), and applies to suits against state agencies in federal court. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). PRPA has moved for summary judgment on the ground that it is not a "person" under § 1983 because it is an agency of the Commonwealth of Pennsylvania, *see Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), and is entitled to immunity under the Eleventh Amendment.

■ A court examines three factors in determining whether an entity is an "arm of

the State" under the Eleventh Amendment: "1) Whether the money that would pay the judgment would come from the state (this includes three . . . factors—whether payment would come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts); 2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and 3) What degree of autonomy the agency has." *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989).

■ Although no single factor is dispositive of the Eleventh Amendment inquiry, the "most important" factor is whether a judgment against the entity in question would be paid out of the state treasury. *See Christy v. Pennsylvania Tpk. Comm'n,* 54 F.3d 1140, 1144 (3d Cir.), *cert. denied,* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995).

### A. State Liability for a Judgment Against PRPA

We consider first: 1) whether the money to pay a judgment against PRPA would come directly from the state treasury; 2) if not, whether PRPA has the funds to pay the judgment; and 3) whether Pennsylvania has immunized itself from responsibility for PRPA's debts. *See Fitchik,* 873 F.2d at 659.

■ PRPA derives approximately sixty percent of its operating revenues from the Pennsylvania treasury, and the remaining forty percent from fees and rentals. The Philadelphia Regional Port Authority Act, which created PRPA, permits the expenditure of public moneys to support the authority, but that support is not mandated. *See* Pa. Stat. Ann. tit. 55, § 697.2(b). Where a state legislature could choose to appropriate funds to support an agency, but is not required to do so, such voluntary payments by the state do not trigger Eleventh Amendment immunity. *Bolden v. SEPTA,* 953 F.2d 807, 819 (3d Cir.1991) (en banc), *cert. denied*

504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992).

The Commonwealth has expressly immunized itself from liability for any judgment against PRPA:

> The authority shall have no power, at any time or in any manner, to pledge the credit or taxing power of the Commonwealth or any political subdivision . . . . [n]o obligations of the authority shall be deemed to be obligations of the Commonwealth or any of its political subdivisions . . . . [and] . . . [t]he Commonwealth . . . shall not be liable for the payment of principal or interest on obligations of the authority. . . .

55 Penn. Stat. Ann. tit. 55, § 697.6(c)(1), (3), (4). The restriction of Commonwealth treasury funds is the most significant factor weighing against Eleventh Amendment immunity. *See Bolden,* 953 F.2d at 819; *Bass v. Consolidated Rail Corp.,* No. 93–0875, 1994 WL 25380, at *2 (E.D.Pa. Jan. 31, 1994).

### B. PRPA's Status Under State Law

Second, we examine PRPA's status under state law, i.e., whether PRPA is separately incorporated, whether it can sue and be sued in its own right and whether it is immune from state taxation. *See Fitchik,* 873 F.2d at 659. PRPA does have to power to sue and be sued and is defined as an "independent agency" under state law. PRPA's status is similar to that of SEPTA. *Compare Bolden,* 953 F.2d at 820, *with* Pa.Stat.Ann. tit. 55, §§ 697.4–.6, .18 (listing powers and privileges of SEPTA and PRPA, respectively). In *Bolden* this combination of factors weighed slightly in favor of granting Eleventh Amendment protection.

### C. PRPA's Autonomy from the Commonwealth

Finally, we analyze whether PRPA is governed by its own Board of Directors, what powers that Board has, who appoints its members and whether it is independent of supervision and control by the Commonwealth. *See Fitchik,* 873 F.2d at 663. "PRPA has somewhat less autonomy than SEPTA because PRPA board members are all appointed by elected Commonwealth offi-

cials, and serve at the pleasure of the authority that appointed them." *Bass,* 1994 WL 25380, at *2; *see* Pa.Stat.Ann. tit. 55, § 697.5. This factor weighs slightly in favor of Eleventh Amendment Immunity.

### D. Balancing

Step one of the balancing weighs heavily against Eleventh Amendment immunity; steps two and three weigh slightly in favor of Eleventh Amendment Immunity. Because the "most important question" is whether the Commonwealth treasury would be affected by a judgment, and it would not, PRPA is not entitled to Eleventh Amendment immunity and is a "person" under § 1983. *See Christy,* 54 F.3d at 1144. The court agrees with the well-reasoned analysis in *Bass,* 1994 WL 25380.

### III. Predatory Acts Relied Upon by Plaintiffs

Plaintiffs have produced evidence of seven predatory acts taken by one or more of the defendants to establish "injuries" redressable under § 1983.

### A. PRPA's Decision Not to Join the Application for Environmental Permit to Develop Publicker

Plaintiffs allege PRPA arbitrarily refused to join its application for an environmental permit to allow development of the Publicker site. Publicker was and is owned by Crestmont Partnership and its affiliate, Delaware Avenue Enterprises ("DAE"). (B. Gelman Dep. at 63). None of the three plaintiffs has an ownership interest in Publicker, although PRPA was obligated under the Amended Packer Lease to "support" permit applications for Publicker submitted on behalf of Holt Cargo.

In February, 1994, DAE personnel approached PRPA to request it to become a co-applicant on a permit application submitted for DAE's planned development of the Additional Parcels and Publicker. (Defs.' Appendix at 333). The permit would allow DAE to fill in the waterfront area from the north side of Packer to the north side of Pier 96 South and create a 2,400 foot berth area extending into the Delaware River under the Walt Whitman Bridge. (Permit Application, Defs.' Appendix at 303). The application stated that the purpose was to create a "multipurpose" marine terminal.

DAE officials submitted the application before receiving a response from PRPA. In March, 1994, the Pennsylvania Department of Environmental Resources ("DER") and the United States Army Corps of Engineers ("USACE") informed DAE of deficiencies in the application. (DER letter, Defs.' Appendix at 335; USACE letter, Defs.' Appendix at 337).

On April 8, 1994, PRPA's Board adopted a resolution that the PRPA would co-apply for the permits as long as the application was "for the sole purpose of enhancing freight and cargo-related uses in a port industrial setting." (PRPA Resolution, Defs.' Appendix at 338). DER again notified DAE on July 7, 1994 that there were deficiencies in its application.

In early July, 1994, Holt, Sr., publicly stated his plans for the Publicker site. (T. Foley Dep. at 185, 193–94). Newspaper articles quoted Holt, Sr., stating he intended to build a hotel on the Publicker property. (Defs.' Appendix at 348). Some articles included an artist's sketch of the proposed hotel. (Defs.' Appendix at 345–49). The *Philadelphia Inquirer* reported Holt, Sr., said he was considering river boat gambling at the Publicker site in the future, but not at that time. (Defs.' Appendix at 345). A proposal for a hotel or gambling facility was inconsistent with PRPA's resolution limiting its support to industrial port development. Holt, Sr.'s, announced plans also conflicted with a PRPA resolution, enacted March 11, 1994, opposing river boat gambling in any port facility owned or controlled by PRPA. (PRPA Resolution, Defs.' Appendix at 371). On the advice of counsel, PRPA declined to co-apply with DAE for the environmental permits.

By letter dated August 3, 1994, McDermott (PRPA's executive director) informed Holt, Sr., of PRPA's reasons for declining to co-apply for the environmental permits. Under the terms of the Amended Packer Lease, PRPA was required to support the permit applications, not co-apply, for permits.

(Amended Packer Lease at §§ 24.2(c), 26). Under Pennsylvania environmental regulations, DAE only needed PRPA's support; it was not necessary for the owner, PRPA, to be a co-applicant for DAE's permit application to be granted. PRPA did not want to be held jointly liable for maintenance of the reconstructed Publicker site, as it might have been as a joint applicant. (Defs.' Appendix at 352). McDermott offered PRPA's support for DAE's application if they could resolve certain outstanding issues.

DAE applied for the permit for Publicker alone. Between November, 1994 and April, 1995, DAE submitted three revised applications deemed deficient by DER. In September and October, 1997, DAE submitted another permit application; this proposal contemplated extending the bulkhead into the Delaware River in a different direction and filling in an increased portion of the river.

Aside from DAE's permit problems, all development at Publicker was halted because Publicker was declared a Superfund site until December 10, 1997. (Defs.' Appendix at 367). Even if permits had been granted when DAE first applied, no development would have been possible until the site's Superfund status was resolved.

## B. PRPA's Interference with Holt Cargo's and Astro's Rights Regarding Pier 96 South

The plaintiffs have stipulated to dismissal of all claims for breach of the Amended Packer Lease, *see* June 18, 1996 Order, because those claims have been submitted to the FMC.

The Amended Packer Lease provided that Holt Cargo's rights to the Additional Parcels, including Pier 96 South, were subordinated to the rights of the then-tenants:

HOLT acknowledges that PRPA has advised HOLT that the Additional Parcels are subject to the leases and other agreements set forth on Exhibit K, copies of which have been provided to HOLT.... HOLT shall not attempt to exercise any rights of landlord under any of such agreements [and] shall conduct all of its operations on the Additional Parcels in conform-

ity with and so as not to violate any of the provisions of any of such agreements or the rights of any tenants or licensees thereunder, and that HOLT shall indemnify, defend and hold PRPA harmless from and against any and all expense, loss, claim, suit or liability suffered by PRPA as a result of HOLT's failure to comply with the covenants contained in this Section.

(Amended Packer Lease at § 24.2(a)(ii)). Exhibit K identified a January 18, 1985 Pasha Lease for Pier 96 South. (Defs.' Appendix at 225).

On January 18, 1985, Pasha entered into a Construction and Sublease Agreement (the "Pasha Lease") under which PRPA agreed to construct a car import and repair facility on Pier 96 South for Pasha's use. (Pasha Lease, Defs.' Appendix at 377). The Pasha Lease contemplated construction of a "Temporary Facility" and then a "New Facility." The lease's ten year term commenced with "substantial completion" of the Temporary Facility. On January 28, 1985, Pasha and PRPA entered into an interim lease agreement (the "Pasha Interim Lease") permitting Pasha to utilize Pier 96 South and Pier 98 Annex, without charge, until the effective date of the Pasha Lease.

In 1991, Holt, Sr. negotiated with Pasha to buy Pasha's lease rights to Pier 96 South; Holt, Sr. offered about $1,000,000. (G. Yamaguchi Dep. at 291, 293; G. Pasha Dep. at 115). In August, 1994, plaintiffs argued Pasha had no rights to Pier 96 South, (G. Pasha Dep. at 115–16), but PRPA did not agree. Pasha continues to occupy Pier 96 South; ships carrying automobiles began arriving at Pier 96 South in January, 1998. (E. Hansen Dep. at 40–41, 153–54). Construction on rail improvements between Piers 96 South and 98 Annex were to begin in February, 1998. (J. McDermott Dep. at 191–92).

Plaintiffs contend that PRPA and Pasha have conspired to deprive Holt Cargo and Astro from developing Pier 96 South under the terms of the Amended Packer Lease. Plaintiffs claim PRPA is permitting Pasha to occupy Pier 96 South without rental payment, in exchange for Pasha's assertion that PRPA has failed to "substantially complete"

the Temporary Facility, so that Pasha's ten-year lease will never become effective and consequently not terminate.

Holt Hauling has no stake in Pier 96 South or the Additional Parcels. Holt Cargo's interest in Pier 96 South is based on a damage claim of lost future profits upon possession and development of Pier 96 South port facilities; Astro's interest is based on the assignment of the amended Packer lease from Holt Cargo to Astro. Holt Cargo and Astro have not identified actual damages associated with Pier 96 South in their Pretrial Memorandum or Supplemental Pretrial Memorandum. Pasha, the third-party currently occupying Pier 96 South, is not a party to this action.

### C. PRPA's Threat to Evict Holt Cargo and Astro from Packer

PRPA, threatening to evict Holt Cargo and Astro from Packer for violations of the Amended Packer Lease, knew that this would be reported to lenders, customers and prospective financing sources. (Compl. ¶¶ 66–70). That allegedly damaged Holt Cargo and Astro by preventing them from acquiring financing and by encouraging customers to take their business elsewhere.

Under the Amended Packer Lease, Holt Cargo agreed to relocate container cranes from Gloucester to Packer. "The HOLT cranes shall be and remain at the [Packer] Terminal until the expiration or termination of the Term and all exercised Renewal Periods subject to Section 2.5(c)." (Amended Packer Lease at § 7.3(b)). Holt Cargo agreed to handle certain container operations at Packer, not Gloucester, to prevent competition between the two sites. (Amended Packer Lease at Art. IV). "HOLT hereby agrees to accommodate and handle at the Terminal during the Term (including all Renewal Periods) all new container business which HOLT secures for Delaware River marine terminal facilities." (Id. at § 4.2(c)).[3] Holt Cargo was not obligated to route new container business through Packer if the con-

tainers came from ships whose primary purpose was not the transportation of containers, or if Packer was unable to handle the containers because of the volume of cargo. (Id.).

In return, PRPA spent over $22,000,000 on improvements to Packer's container facility, including $800,000 for a crane rail line to transport the cranes from Gloucester to Packer, and about $5,500,000 to purchase Holt's PACECO crane. (J. LaRue Dep. at 249; Defs.' Appendix at 442, 443, 446, 945–46).

In September, 1994, PRPA discovered that Holt Cargo was considering moving two cranes from Packer back to Gloucester to handle container shipping at Gloucester. (J. Jacovini Dep. at 219). By letters dated October 4, 1994, and October 26, 1994, Tom Holt, Sr., confirmed Holt Cargo's plan. (Thomas J. Holt letter, Defs.' Appendix at 451). PRPA believed this breached the Amended Packer Lease, § 7.3(b), requiring the cranes to remain at Packer. PRPA also considered Holt Cargo's plans a violation of the lease provision requiring Holt Cargo to handle virtually all new container business at Packer, not Gloucester. (Id. at § 4.2).

By letter dated October 20, 1994, PRPA informed Holt Cargo it would be in breach of the lease if it moved cranes from Packer to Gloucester. (J. McDermott letter, Defs.' Appendix at 449; J. McDermott Dep. at 356). PRPA informed Holt Cargo that violation of the lease could result in "the entry of an action and judgment in ejection." (J. McDermott letter, Defs.' Appendix at 450).

Subsequent to sending the letter, PRPA engaged in negotiations with the Holt entities. (J. Jacovini Dep. at 244; J. McDermott Dep. at 339). During a meeting in December, 1994, Joseph H. Jacovini, chairman of PRPA's board, offered to let Holt Cargo move cranes to Gloucester as long as a minimum amount of business remained at Packer; Thomas Holt, Sr., responded that the

---

3. "For the purposes of Section 4.2, HOLT shall mean Holt Cargo Systems, Inc., its parent from time to time, and all present and future subsidiaries and affiliates, and Transferee (as hereinafter defined), and Thomas J. Holt and all mem-

bers of Thomas J. Holt's immediate family during the time they are employed by Thomas J. Holt or any of the entities described in this Section 4.4." (Amended Packer Lease § 4.4).

proposal seemed fair. (J. Jacovini Dep. at 214–42).

Plaintiffs argue PRPA's unjustified letter that ejection was a potential consequence of a breach of the Amended Packer Lease discredited them with financial lenders and turned away customers. (T. Holt, Sr., Dep. at 190–91; L. Robbins Dep. at 116–17). Plaintiffs claim that PRPA's refusal to allow Holt Cargo to move cranes to Gloucester led to "additional financing costs" for the cranes. Plaintiffs have not identified any financing lost as a result of this letter; nor have they identified any lender who raised interest costs or changed other financing terms. Bernie Gelman, Holt Cargo's CFO, stated that, while the PRPA letter may have caused him "indigestion," it did not inhibit any financing. (B. Gelman Dep. at 153–54). Holt Cargo and its counsel informed lenders that this litigation would have no effect on Holt Cargo operations. (Id.). The audited financial statements did not identify PRPA's letter as a material threat to plaintiffs' business stability. (Defs.' Appendix at 639, 663, 686, 729, 744, 753, 1993–95 Financial Statements, 1996 Guaranty Agreement, 1996 Certificate for Astro Financial Matters, 1996 Camden Improvement Authority Board Opinions).

Plaintiffs contend PRPA acted arbitrarily in suggesting the possibility of ejection for possible non-compliance with the Amended Packer Lease.

### D. PRPA's Obligations Under the Amended Packer Lease

Plaintiffs contend that PRPA arbitrarily refused to honor its obligations under the amended lease "to dredge berths, provide capital improvements, and repair property, including container cranes," and DRPA arbitrarily refused to provide funds to PRPA for dredging. (Compl. ¶¶ 71–75).

Under the Amended Packer Lease, PRPA is obligated to dredge Packer regularly. (Amended Packer Lease at § 7.7). There is evidence that PRPA has done dredging at the site. (D. Dambly Dep. at 437; Defs.' Appendix at 488, 522). Holt Cargo is responsible for taking soundings and notifying PRPA of depth problems. PRPA also agreed to spend $16,000,000 on capital improvements. (Amended Packer Lease at § 7.7; Defs.' Appendix at 213–18). To date, PRPA has spent over $22,000,000 in capital improvements at Packer. (J. LaRue Dep. at 249; J. McDermott letter, Defs.' Appendix at 443).

The Amended Packer Lease also required PRPA to renovate two KOCKS cranes located at Packer. (Amended Packer Lease at Ex. H). PRPA completed the crane renovation in 1996, and spent over $5,000,000 to do so. Plaintiffs claim the crane renovation was not completed, (T. Holt, Jr. Dep. at 103–04), and that DeMariano claimed that PRPA would not invest any further money in Packer during this litigation. PRPA has spent over $1,000,000 on dredging at Packer since the inception of this lawsuit. (Defs.' Appendix at 524, 525).

Claims for breach of the lease terms are before the FMC and not asserted here. Plaintiffs' claim under the Amended Packer Lease is that PRPA acted arbitrarily and in violation of due process in failing to perform its obligations under the lease.

### E. False or Deceptive Advertising by PRPA, DRPA & PPC

Plaintiffs allege that PRPA, DRPA and PPC jointly published advertisements falsely attributing operation of the Packer Avenue Terminal to them to mislead customers into contacting them for business. (Compl. ¶¶ 76–78). The crux of plaintiffs' allegation is that two advertisements did not properly identify Packer as a Holt affiliate. The first advertisement was a brochure entitled "The Ports of Philadelphia and Camden: An Overview of Facilities and Capabilities"; this was jointly produced by PRPA and PPC. (Defs.' Appendix at 528). The brochure did not list every private port business. However, Packer did receive a two page description. (Id. at 541–42).

The second advertisement was a January, 1995 feature in the *Journal of Commerce* concerning the Port of Philadelphia and Camden. Packer was mentioned numerous times. (Defs.' Appendix at 568–70, 575, 578). Holt Cargo's telephone number was listed. Thomas Holt, Sr., was referred to as a lead-

ing stevedore in the Port District. Holt Cargo was offered the chance to contribute to the *Journal of Commerce* feature, but declined to do so. (J. McDermott Dep. at 122–23; J. Murphy Dep. at 121).

### F. PRPA's Decision Not to Lease Piers 82 & 84 to Holt Cargo

Plaintiffs allege PRPA arbitrarily refused to lease Piers 82 and 84 to Holt Cargo and to another company that planned to use Holt Cargo for its stevedoring needs. (Compl. at ¶¶ 79–83). In 1994, PRPA received three proposals for lease of Pier 82; one of those proposals came from Refrigerated Distribution Centers ("RDC"), affiliated with Thomas Holt, Sr., but not a party to this action. None of the three plaintiffs submitted any proposals for Pier 82. PRPA evaluated the bids and awarded the lease to Penn Trucking. (J. Jacovini Dep. at 174–75, 179–80).

There were several differences between the bids submitted by RDC and Penn Trucking. PRPA's bidding instructions stated, "Faxes will not be accepted." (Defs.' Appendix at 597). Nevertheless, RDC faxed its proposal to PRPA. (RDC Fax, Defs.' Appendix at 581–82). RDC did not accept PRPA's insurance requirements, but offered to negotiate them instead. (*Id.* at 586). Penn Trucking identified two specific customers; RDC stated it was negotiating with potential customers. Penn Trucking had hired Jack Reimer, a specialist in fruit handling, to operate Penn Trucking's fruit cargo facilities. (J. McDermott Dep. at 266–69).

RDC is not a party to this action. Penn Trucking, the third-party awarded the bid by PRPA, is not a party to this action. No Holt entity submitted a bid for Pier 84.

### G. Stealing Plaintiffs' Customers

Plaintiffs' seventh alleged predatory act is that PRPA and non-party SJPC have diverted customers from Holt Cargo and Holt Hauling by offering subsidized rates, free rent and other benefits to competitors, solely to cause economic loss to Holt Cargo and Holt Hauling. (Compl. at ¶¶ 84–86). Plaintiffs allege they lost intermodal customers as a result of PRPA's decision to offer better lease terms to other third-parties. But the testimony of every intermodal shipper submitted was that neither PRPA, DRPA nor PPC approached or solicited them to leave Packer. (J. Soroko Dep. at 17; D. Piccarelli Dep. at 19–26, 49–50; P. Robinson Dep. at 205–06, 208–21; M. Oppenheimer Dep. at 32–37; E. Kelly Dep. at 18–19; J. Mullany Dep. at 23; E. Hopkins Dep. at 13–14, 23–28, 47; J. Millard Dep. at 13–14, 22–25).

DRPA does not own any facilities to which to divert "customers" and does not have any "customers" of its own. PRPA's only "customers" are lessees; PRPA does not operate any facilities. Some PRPA staff have suggested PRPA begin to operate port facilities rather than lease them to operators, but neither PRPA nor DRPA operate any port facilities. PPC owns the Ameriport Intermodal Yard, but that is a unique facility; there is no allegation that plaintiffs' customers were diverted there from Packer.

## IV. Damages

### A. Holt Cargo

Holt Cargo's leasehold interest in Packer was never disturbed and continues. Operating revenues at Packer went from $48,273,750 in 1993 to $47,229,972 in 1996; for the first nine months of 1997, operating revenues were $42,358,637. (Defs.' Appendix at 646, 716, 722). In 1993, Holt Cargo had a refrigerated warehouse at Packer; that facility is now operated by RDC, a Holt affiliate but non-party to this action; it generated an additional $2,908,218 in revenue in 1996. (*Id.* at 716). Holt Cargo's net income increased from a loss of $2,536,052 in 1993 to $6,800,698 in profit in 1996. Holt Cargo's net income was $10,800,976 in the first nine months of 1997. (*Id.* at 646, 716, 722). Holt Cargo has not identified any customers lost because of defendants' actions.

### B. Astro

Astro continues to enjoy a sub-leasehold interest in Packer. Since taking the assignment of the Amended Packer Lease from Holt Cargo, Astro has been charging the rent due PRPA plus 15%. That rent generated in excess of $1,000,000 in 1993, $2,000,000 in 1994 and $3,000,000 in 1996. (Defs.'

Appendix at 625, 639, 695, 709). Astro now sub-leases other parts of Packer to additional tenants for rents that produce an additional $397,500. (RDC Leases, Defs.' Appendix at 947, 951, 957). Astro has not produced evidence of sub-tenants lost because of defendants' actions.

### C. Holt Hauling

Since the inception of the alleged conspiracy among defendants and other non-parties, Holt Hauling has leased Gloucester to tenants for rates "far in excess of fair value." (B. Gelman Dep. at 60–61). Plaintiffs have testified that DAE "intended" to hire Holt Hauling to develop the Publicker site when DAE's permits were approved; Holt Hauling alleges damages based on loss of possible future contracts with DAE.

### V. Equal Protection

▮▮▮ Plaintiffs allege defendants violated their equal protection rights under 42 U.S.C. § 1983.[4] The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Equal protection "directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920)). "This provision creates no substantive rights." *Vacco v. Quill,* 521 U.S. 793, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997); *see San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Only when a state "adopts a rule that has a special impact on less than all persons subject to its jurisdiction" does a question arise as to whether the Equal Protection Clause is violated. *Alexander v. Whitman,* 114 F.3d 1392, 1406 (3d Cir.1997) (quoting *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587–88, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979)), *cert. denied,* —— U.S. ——, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997).

▮▮▮ If governmental action "neither burdens a fundamental right nor targets a suspect class, we will uphold the ... classification so long as it bears a rational relationship to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). The action "is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic'" of government activity. *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)).

▮▮▮ Government agencies have "'a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.'" *Alexander,* 114 F.3d at 1407 (quoting *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). Equal protection is only implicated when a government actor "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Personnel Administrator v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); "a person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Huebschen v. Department of Health & Social Servs.,* 716 F.2d 1167, 1171 (7th Cir.1983); *see Davage v. United States,* No. 97–1002, 1997 WL 180336, at *3 (E.D.Pa. Apr. 16, 1997); *Yaron v. Township of Northampton,* No. 88–9144, 1989 WL

---

4. The statute provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
 42 U.S.C. § 1983.

100920, at *5 (E.D.Pa. Aug. 29, 1989), *aff'd,* 908 F.2d 965 (3d Cir.1990). The burden is on plaintiffs "to negate every conceivable basis which might support" the challenged discriminatory action. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973).

### A. Different Treatment of Similarly Situated Entities

#### 1. Similarly Situated Entities

■ The first step in an equal protection analysis is to ascertain whether the plaintiffs were treated differently than similarly situated entities. *See Cleburne,* 473 U.S. at 439, 105 S.Ct. 3249. In their Complaint, plaintiffs pleaded that American Transport Lines, Inc. ("American Transport"), Tioga Fruit Terminal, Inc. ("Tioga"), Maritime Terminals of Pennsylvania ("Maritime Terminals") and Delaware River Stevedores, Inc. ("DRS") were competitors and lessees of PRPA provided favorable terms and conditions not provided to Holt Cargo. (Compl. ¶ 91). Plaintiffs now claim that Del Monte, currently leasing Beckett from SJPC, is a similarly situated entity.

■ Defendants argue that plaintiffs have failed to show that they are similarly situated to the other entities they allege received more favorable lease terms. Defendants argue that "[e]very piece of land [is] unique." *Publicker v. Commissioner of Internal Revenue,* 206 F.2d 250, 253 (3d Cir. 1953), *cert. denied,* 346 U.S. 924, 74 S.Ct. 312, 98 L.Ed. 418 (1954). "[T]he mere fact that [a defendant] has signed contracts with [a competitor] different from those it has signed with [a] [p]laintiff, for different parcels of land, is not enough to trigger an equal protection inquiry." *Hill Aircraft & Leasing Corp. v. Fulton County,* 561 F.Supp. 667, 678 (N.D.Ga.1982), *aff'd,* 729 F.2d 1467 (11th Cir. 1984).

Plaintiffs are the largest marine terminal operators in the Port District, but each plaintiff engages in a different business. Holt Hauling holds title to and leases Gloucester to various tenants. (Compl. ¶ 10). A landlord not operating any marine services cannot be similarly situated to companies actually providing marine services to ships passing through the port. Astro is only a holding company assigned Holt Cargo's rights under the Amended Packer Lease that were immediately sub-leased back to Holt Cargo at a higher rent than is due PRPA. (*Id.* ¶¶ 5–7).

Holt Cargo provides stevedoring, warehousing and other terminal services at Packer. (*Id.* ¶ 8). It is similar in that respect to the port competitors listed in plaintiffs' Complaint. Tioga leases and operates the Tioga Fruit Terminal. (Defs.' Appendix at 833). Marine Terminals leases space at the Tioga Terminal in which it stores containers. (*Id.* at 885). DRS provides stevedoring services at Tioga. (R. Palaima Dep. at 10). Defendants are correct that these other entities are distinct from plaintiffs in several ways, but they all engage in port-related business of one kind or another. As the court previously held, *see Holt Cargo,* 1997 WL 714843, at *8, any two entities will look sufficiently dissimilar if examined at a microscopic level; the court will assume these entities are similar enough for purposes of equal protection.

■ Plaintiffs complain that DRPA lent $2,500,000 to SJPC to improve the facility it leased to Del Monte at the same time that DRPA denied a loan request for $20,000,000 by Dockside Refrigerated Warehousing ("DRW"), a tenant of Holt Hauling at Gloucester. The DRW loan request was to construct a refrigerated warehouse at Kaighn Point, a marine terminal in Camden, New Jersey. But SJPC is a public entity of the State of New Jersey and DRW is a private for-profit entity. DRPA is not required to subsidize development for a private entity to the same extent as for a public agency; there is a fundamental difference between public agencies and private companies. *See, e.g., Wood v. Rendell,* No. 94–1489, 1995 WL 676418, at *4 (E.D.Pa. Nov. 3, 1995). There is a considerable difference between a $2,500,000 loan and a $20,000,000 loan. These two situations were fundamentally different as a matter of law.

#### 2. Different Treatment

■ Even if the other entities with PRPA leases are similarly situated to plaintiffs, the court must determine that they

were treated in a materially different manner for plaintiffs to prevail. The Packer facility, leased by PRPA to Holt Cargo, is larger than any other port facility. (T. Holt, Jr., Dep. at 250–51; Defs.' Appendix at 538–39, 542). Holt Cargo's lease is for fifty years, at least ten times longer than any lease between PRPA and Holt Cargo's competitors. Packer is the most modern port facility and is ideally located near the mouth of the port, near the Ameriport Intermodal Yard; that allows Holt Cargo to avoid higher drayage costs paid by competitors located farther from Ameriport. (Defs.' Appendix at 538–39, 542).

The Amended Packer Lease also provides $16,000,000 in PRPA capital funds, more expensive capital improvements than in any of the leases between PRPA and Holt Cargo's competitors. (Amended Packer Lease Art. VII & Ex. H). The Amended Packer Lease permits Holt Cargo to operate Packer as a closed facility; this avoids the need to hire outside stevedores. (J. McDermott Dep. at 66–67).

These terms do not appear in any PRPA lease with the competitors cited by plaintiffs. The Tioga Fruit Terminal lease was for a three year term, extended for one additional year. (Tioga Fruit Terminal Lease ¶ 2(a)). Tioga is not a stevedore as is Holt Cargo, so it must hire outside stevedores to perform services. (Defs.' Appendix at 810).

The Maritime Terminals lease is for a five acre parcel of terminal space at Tioga. Maritime Terminals is not a stevedore so it must hire outside stevedores when necessary. The Maritime Terminals facility does not have cranes or berthing facilities, as does Packer. (Maritime Terminals Lease ¶ 1.1).

DRS is a stevedore like Holt Cargo, but did not lease from PRPA or operate a PRPA port terminal at all during the relevant time period.

There undoubtedly are differences between the Amended Packer Lease and the PRPA leases with Holt Cargo's competitors. Holt Cargo's lease is more favorable than the leases with the other companies. PRPA has leased to Holt Cargo for the longest term the largest, most modern and most conveniently located terminal in the port. PRPA has provided Holt Cargo with the most funding (approximately $6,000,000 more for Packer improvements than is required under the Amended Packer Lease). A governmental agency offer of different lease or contract terms to different entities for different pieces of property is not discriminatory treatment under the Equal Protection Clause. *See, e.g., Hill Aircraft*, 561 F.Supp. at 678.

**B. Rational Basis**

Even if plaintiffs have established that SJPC and lessees of PRPA were similarly situated and treated in a materially different and better manner, plaintiffs must show that defendants acted irrationally. *See Artway v. Attorney General of New Jersey*, 81 F.3d 1235, 1267 (3d Cir.1996). "[O]fficial action 'is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" *Barnes*, 982 F.Supp. at 983 (quoting *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249). Plaintiffs have not alleged they belong to any suspect class deserving a heightened standard of review.

Government action related to business or commercial activity is accorded deference because it does not involve a suspect class. *See, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 732, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). This deference is appropriate "because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others." *Rogin v. Bensalem Township*, 616 F.2d 680, 687 (3d Cir.1980), *cert. denied sub nom., Mark–Garner Assoc., Inc. v. Bensalem Township*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).

Governmental commercial regulation or activity " 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality' such that 'the varying treatment of different groups … is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.'" *Swin*

*Resource Sys., Inc. v. Lycoming County,* 883 F.2d 245, 256 (3d Cir.1989) (quoting *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 463, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988)), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). Challengers of an economic rule or action must "negat[e] every conceivable basis which might support it." *Madden v. Kentucky,* 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940).

"Differences in the types of business conducted by these companies is certainly a factor in equal protection analysis, and in some cases this distinction alone may be sufficient to uphold the challenged legislation." *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth.,* 825 F.2d 367, 370 (11th Cir.1987) (citing *Allied Stores v. Bowers,* 358 U.S. 522, 526–27, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); *Williamson v. Lee Optical,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *State Board of Tax Comm'rs v. Jackson,* 283 U.S. 527, 537–42, 51 S.Ct. 540, 75 L.Ed. 1248 (1931)), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).

■ An interest in maximizing revenues or encouraging the development of competing private enterprises is a legitimate and rational purpose. *See Allright Colorado, Inc. v. City and County of Denver,* 937 F.2d 1502, 1512 (10th Cir.), *cert. denied,* 502 U.S. 983, 112 S.Ct. 587, 116 L.Ed.2d 612 (1991); *Alamo,* 825 F.2d at 371–73. A governmental agency may seek to encourage other private businesses in order to create competition for existing private companies and prevent the formation of a monopoly. *See Pontarelli v. City of Chicago,* 929 F.2d 339, 341 (7th Cir. 1991) (City did not violate equal protection by preventing all in-city taxi companies from using the taxi dispatcher booths at the airport, because the plan encouraged suburban taxi companies to provide livery services at the airport but limited excessive congestion at the dispatch stations.).

Even if the identified competitors were similarly situated to Holt Cargo and PRPA offered them different lease terms, PRPA's conduct would not have been arbitrary or irrational. Each of the leases dealt with a separate and distinct parcel of land, with different facilities, equipment and access to the intermodal yard and the mouth of the port; it would have been "irrational" if PRPA had not made distinctions among the different leases. Even if PRPA offered slightly more favorable lease terms or different development subsidies to competitors, it was not irrational for a government agency to seek to promote competition by diversifying the private sector. Under the Amended Compact as approved by Congress, DRPA's mission was to unify and strengthen the Port District. It was not irrational for DRPA to pursue those statutory goals.

■ It was also not irrational for DRPA to reject a $20,000,000 loan to DRW while approving a loan to SJPC for $2,500,-000. The difference in the amounts of money involved provides a rational basis for approving the smaller loan while denying a loan for almost ten times as much money. Even if DRPA did harbor an improper motive in denying DRW's loan request, there was a separate rational basis for the decision. The mere fact that a governmental entity harbored an invidious intent does not result in a violation of equal protection when the agency had other legitimate reasons to act. *See Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 271 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Palmer v. Thompson,* 403 U.S. 217, 224–26, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971).

Plaintiffs have not established that they were similarly situated to SJPC with respect to the DRPA loan applications or were treated in a materially worse fashion with respect to the PRPA lease terms or capital expenditures on the leased premises; plaintiffs have not shown they were treated in a materially different, discriminatory manner. Furthermore, even if plaintiffs were treated differently than SJPC and the private competitors, they have failed to establish that the differences in treatment were arbitrary or irrational. Summary judgment will be granted in favor of defendants on plaintiffs' equal protection claim.

## VI. Substantive Due Process

 The Fourteenth Amendment declares that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "[W]hen complaining of a violation of substantive due process rights, a plaintiff must prove that the governmental authority 'acted to infringe [ ] a property interest encompassed by the Fourteenth Amendment.'" *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 600 (3d Cir.) (quoting *Acierno v. Cloutier,* 40 F.3d 597, 616 (3d Cir.1994)), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995).

 The Due Process Clause was "'intended to secure the individual from the arbitrary exercise of the powers of government.'" *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 111, 28 L.Ed. 232 (1884) (quoting *Bank of Columbia v. Okely,* 4 Wheat. (17 U.S.) 235, 244, 4 L.Ed. 559 (1819)). Substantive due process is implicated by deliberate, not negligent, governmental action. *See Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986).

 A deprivation must have been committed by a person acting under color of state law. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 149, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Price,* 383 U.S. 787, 793–94, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). To prevail under § 1983, the plaintiff seeking to recover against a governmental agency must prove an actual deprivation of a constitutional right. A plaintiff may not recover under § 1983 for violation of due process because of a mere breach of state law. *See Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *DeShaney v. Winnebago Soc. Servs.,* 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

 Section 1983 "is not a source of substantive rights," *Northeast Jet Ctr., Ltd. v. Lehigh–Northampton Airport,* No. 90–1262, 1997 WL 230821, at *3 (E.D.Pa. May 5, 1997) ["*Northeast Jet Center II*"]; it only provides "'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Section 1983 does not provide "a right to be free of injury wherever the State may be characterized as the tortfeasor." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). A plaintiff must show a deprivation of a federally protected right.

 Therefore, a substantive due process analysis under § 1983 involves a three-step process: 1) state action; 2) the existence of a protected property interest; and 3) arbitrary or irrational deprivation of that interest.

### A. State Action

Defendants all concede that they are state actors for purposes of constitutional analysis.

### B. Property Interest

Plaintiffs must establish a deprivation of a "certain quality of property interest" that is constitutionally protected. *DeBlasio,* 53 F.3d at 600. The Supreme Court has not defined the full spectrum of property interests protected under the substantive component of the Due Process Clause. *See Reich v. Beharry,* 883 F.2d 239, 243 (3d Cir.1989).

 "[W]hile property rights for procedural due process purposes are created by state law, substantive due process rights are created by the Constitution." *DeBlasio,* 53 F.3d at 599; *see Mauriello v. University of Medicine and Dentistry,* 781 F.2d 46, 50 (3d Cir.) (citing *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 229–30, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)), *cert. denied,* 479 U.S. 818, 107 S.Ct. 80, 93 L.Ed.2d 35 (1986). For procedural due process, state law defines the existence or scope of a property interest. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,*

408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

██ However, "what constitutes a property interest in the procedural due process context might not constitute one in that of substantive due process." *Reich*, 883 F.2d at 244. "[N]ot all property interests worthy of procedural due process protection are protected by the concept of substantive due process." *Id.* "[O]nly fundamental property interests are worthy of substantive due process protection." *Independent Enter., Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 (3d Cir.1997).

██ "[O]wnership is a property interest worthy of substantive due process protection." *Id.* at 1180; *see Ersek v. Township of Springfield*, 822 F.Supp. 218, 221 n. 3 (E.D.Pa.1993), *aff'd*, 102 F.3d 79 (3d Cir. 1996). Likewise, a lease is a property interest worthy of substantive due process protection. *See DeBlasio*, 53 F.3d at 601 n. 10; *see also Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 217–18 (3d Cir.), *cert. denied*, 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988). But the evidence is undisputed that plaintiffs' ownership or leasehold interests have not been interrupted or terminated: Holt Hauling's ownership of Gloucester continues; Holt Cargo's lease of Packer from PRPA and sub-lease of the same from Astro remain in effect; and Astro's assignment of the Amended Packer Lease from Holt Cargo is undisturbed. (T. Holt, Sr. Dep. at 191–92, 195). Plaintiffs allege an attempt to drive them out of business that has not occurred. Therefore, the property interests of which plaintiffs have in fact been deprived or interfered with must involve something less substantial.

Plaintiffs base the injuries underlying their substantive due process claim on the following: loss of customers; lost profits in general; loss of a bid; and breach of a lease. Even if these allegations are proved, they do not establish a constitutional substantive due process claim.

### 1. The Intent to Drive Plaintiffs from the Port District

██ Plaintiffs contend that the seven predatory acts should be viewed together as evidence of a master plan to drive them out of business, as well as separate due process violations. As part of a larger plan to drive plaintiffs' out of business, plaintiffs have failed to state a claim under the Due Process Clause. There is no dispute that each of the three plaintiffs is still in business and has increased profits over the past several years; defendants have not driven plaintiffs out of business.

Plaintiffs have produced evidence that individual representatives of defendant agencies have attempted to drive them out of business or would like the defendants to do so, but this evidence is insufficient to infer agency conduct.

██ Section 1983 does not permit recovery for an attempt to deprive one of a constitutional right; there must be an actual deprivation before recovery is permitted. *See Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir.1992); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir.1990); *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir.1987); *Dooley v. Reiss*, 736 F.2d 1392, 1394–95 (9th Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980); *Ashford*, 837 F.Supp. at 115; *Defeo v. Sill*, 810 F.Supp. 648, 658 (E.D.Pa.1993). Plaintiffs must prove an actual constitutional injury in order to recover; to establish such an injury, plaintiffs rely on the seven predatory acts.

### 2. Pier 96 South

██ Plaintiffs argue PRPA is conspiring with non-party Pasha to prevent Holt Cargo from gaining access to Pier 96 South. "[T]he mere breach of a lease contract by a government instrumentality does not necessarily give rise to a violation of constitutional dimension." *Diamond Flite Ctr., Ltd. v. New Castle County*, No. 95–725, 1996 WL 308722, at *3 (D. Del. June 3, 1996). A plaintiff cannot give "a constitutional gloss to a commercial ... contract and lease" to sustain a § 1983 action. *Vartan v. Nix*, 980 F.Supp. 138, 143 (E.D.Pa.), *aff'd*, 133 F.3d 912 (3d Cir.1997). There is no general con-

stitutional right to have a government agency abide by the terms of a contract.

■ "[T]wo general types of contract rights are recognized as property protected under the Fourteenth Amendment: (1) where 'the contract confers a protected status, such as those characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits'; or (2) where 'the contract itself includes a provision that the state entity can terminate the contract only for cause.'" *Linan–Faye Construction Co. v. Housing Auth. of the City of Camden,* 49 F.3d 915, 932 (3d Cir. 1995) (quoting *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1399 (3d Cir.1991)).

Neither situation applies here. The Amended Packer Lease is between PRPA and Holt Cargo, both sophisticated port entities. The lease contract does not confer any protected status similar to that of a welfare recipient or tenured faculty member at a state institution. The lease has not been terminated, so whether termination was restricted to "for cause" is irrelevant.

There is no constitutional right to be free from breach of lease terms; " 'such a wholesale federalization of state public contract law seems far afield from the great purposes of the due process clause.'" *Id.* at 932 (citation omitted); *see also Jetstream Aero Servs. v. New Hanover County,* 672 F.Supp. 879, 883 (E.D.N.C.1987) ("To allow plaintiff's alleged right to quiet enjoyment of its lease to reach constitutional dimensions, as plaintiff would have this court do, would be to open the doors to an already crowded federal forum as to all lease disputes.").

■ Plaintiffs argue entitlement to lease rights to Pier 96 South on termination of the present Pasha Lease; they would develop the pier and derive future income from such development. But there is no constitutionally protected property interest in "potential business." *Northeast Jet Center II,* 1997 WL 230821, at \*9.[5] "Despite the interest that tort and contract law has in preserving business relationships, that is not a protected property interest worthy of constitutional protection." *Id.*

■ Plaintiffs have no fundamental property interest "in obtaining optimal results from their businesses." *Norfolk Fed. of Business Dists. v. Department of Housing & Urban Dev.,* 932 F.Supp. 730, 738 (E.D.Va.), aff'd, 103 F.3d 119, 1996 WL 671293 (4th Cir.1996). "The mere possibility of remote or speculative future injury or invasion of rights will not suffice." *Reichenberger v. Pritchard,* 660 F.2d 280, 282 (7th Cir.1981); *see Olitsky v. O'Malley,* 597 F.2d 295, 298–99 (1st Cir.1979); *Raitport v. Provident Nat'l Bank,* 451 F.Supp. 522, 530 (E.D.Pa.1978).

■ The interest in obtaining the maximum return on investment is not a "fundamental" right. *See National Paint & Coatings Assoc. v. City of Chicago,* 45 F.3d 1124, 1130 (7th Cir.), *cert. denied,* 515 U.S. 1143, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). Whether plaintiffs are basing their substantive due process claim for Pier 96 South on PRPA's alleged conspiracy to breach the lease or their loss of future business opportunities, there is no right to recover for such actions under the Due Process Clause and § 1983.[6]

---

**5.** Plaintiffs cite to *Northeast Jet Ctr., Ltd. v. Lehigh–Northampton Airport Auth.,* No. 90–1262, 1996 WL 442784 (E.D.Pa. Aug.1, 1996) [*"Northeast Jet Center I"*], for the proposition that a substantive due process claim may exist for allegations of future loss of business. *Northeast Jet Center I* was decided on a motion to dismiss; the court assumed at the preliminary stages of the litigation that plaintiffs had stated a claim upon which relief could be granted. The same court in *Northeast Jet Center II* granted summary judgment in favor of defendants on these same claims. *See Northeast Jet Center II,* 1997 WL 230821.

**6.** Plaintiffs also cannot obtain injunctive relief against PRPA defining their rights and duties regarding Pier 96 South under the Amended Packer Lease because such determination would affect the rights of non-party Pasha, the current tenant of Pier 96 South. Pasha, as an entity affected by an action interpreting the provisions of the contract, is an indispensable party. *See, e.g., Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir.1975), *cert. denied sub nom., Susenkewa v. Kleppe,* 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976).

In 1996, Pasha, seeking a declaration that its rights to Pier 96 South were superior to Holt

### 3. Publicker

■ Plaintiffs argue PRPA refused to jointly apply with DAE for developmental permits for the Publicker site so that receipt of a permit was delayed. The developmental permits did not list any of the plaintiffs as the applicant; non-party DAE, the owner of Publicker, applied for the permits. Defendants argue no plaintiff has standing to raise this claim. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ " '[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). In order to satisfy the standing requirement, a party must demonstrate: 1) an "injury in fact" which is both "concrete and particularized" and "actual or imminent"; 2) a causal relationship between the injury and the challenged conduct so the injury "fairly can be traced to the challenged action of the defendant"; and 3) a likelihood that the injury will be redressed by a favorable decision. *Northeastern Florida Chapter of Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

The Amended Packer Lease gives Holt Cargo certain contract rights for Piers 96 South, 98 South and 100 South, known as the Additional Parcels. Publicker is not included in that list. (Amended Packer Lease § 24.2(a)). But under § 26 of the Amended Packer Lease, PRPA agreed to support any permit application submitted on behalf of Holt Cargo for Publicker. Holt Cargo's interest is sufficient to establish standing to raise this claim.

■ Holt Cargo has standing under the Amended Packer Lease to challenge PRPA's decision not to co-apply for environmental and developmental permits with DAE, but the decision was not a violation of substantive due process. It was not PRPA (or DRPA or PPC, for that matter) who had authority to grant or deny DAE's permit applications. DAE's applications were submitted to and reviewed by the Pennsylvania Department of Environmental Resources and the United States Army Corps of Engineers. Plaintiffs contend that PRPA's refusal to co-apply for the permits caused these other governmental bodies to delay granting the permit to the injury of Holt Cargo.

PRPA did, in fact, offer to support DAE's permit applications; PRPA simply chose not to be a co-applicant. Under Pennsylvania environmental regulations, DAE only needed PRPA's support; it was not necessary for PRPA to be a co-applicant to grant DAE's permit application. Under the Amended Packer Lease, PRPA was required to support, not co-apply, for permits to develop the Additional Parcels, (Amended Packer Lease

Cargo's, brought a declaratory judgment action against PRPA, Holt Cargo, Holt Hauling, and Astro. Holt Hauling and Astro, arguing that a challenge to Holt Cargo's lease to Pier 96 South would have to be brought before the FMC, moved to dismiss for lack of jurisdiction. The Court, granting this motion on behalf of Holt Hauling and Astro, stated that it would "adjudicate Pasha's lease interests in Pier 96 South (Count III), and the obligation of PRPA thereunder with regard to lease renewal and expansion of Pasha's permitted activities under the lease (Count IV). Because of its interest in the outcome, Holt may move to intervene in Pasha's action against PRPA." (*Pasha v. PRPA*, Civil Action No. 96–6779, Order of October 28, 1997). Holt Cargo moved to intervene, and assert a counterclaim for matters before the FMC. Pasha

responded that Holt Cargo was still a party, because the court had not dismissed the action against Holt Cargo. The court subsequently dismissed all claims against Holt Cargo, denied Holt Cargo's motion to intervene because it added claims not properly before this court, and gave Holt Cargo another opportunity to intervene. Holt Cargo again moved to intervene, this time asserting even more claims. The court denied Holt Cargo's motion because it went beyond the scope of the action properly within this court's jurisdiction, and found that Holt Cargo's interests were adequately protected by PRPA. Holt Cargo was allowed to participate *amicus curiae*. (*See Pasha v. PRPA*, Civil Action No. 96–6779, Memorandum and Order of December 23, 1997.). An appeal from this order is pending.

at § 24.2(c)), and Publicker (*Id.* at § 26). PRPA offered to support DAE's applications as long as such support did not conflict with PRPA's resolutions regarding use of PRPA property for industrial activities instead of entertainment.

Any harm suffered by Holt Cargo as a result of PRPA's offer to support, but not co-apply, for developmental permits, may have caused the Pennsylvania Department of Environmental Resources and the Army Corp of Engineers to delay issuing permits and may have caused Holt Cargo and Holt Hauling loss of future business opportunities, but such loss is nothing more than an "interest in potential business" that is outside the scope of substantive due process protection. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130; *Reichenberger,* 660 F.2d at 282; *Olitsky,* 597 F.2d at 298–99; *Northeast Jet Center II,* 1997 WL 230821, at *9; *Norfolk Fed. of Business Dists.*, 932 F.Supp. at 738; *Hill Aircraft,* 561 F.Supp. at 678; *Raitport,* 451 F.Supp. at 530.

Plaintiffs cite *Blanche Road Corp. v. Bensalem Township,* 57 F.3d 253 (3d Cir.1995), as authority that delay damages caused by governmental interference with a permit process can violate due process. In *Blanche Road,* plaintiff corporation had a written option to purchase certain lots in a subdivision. *See id.* at 265. They contended that municipal officials deliberately and improperly interfered with and delayed issuing building permits. The Court of Appeals held that the plaintiff had stated a cause of action under the Due Process Clause and met the burden of proving non-speculative damages caused by defendants' deliberate interference and delay. *See id.* at 265, 268. But under *Blanche Road,* if " 'uncertainty concerns the fact of damages, not the amount,' " there is no cause of action. *Id.* at 265 (citation omitted).

■ Here, Publicker was still a Superfund site until December, 1997. Even if development permits had been issued promptly, there could have been no development on Publicker until December, 1997. There is no substantive due process right for denial of a permit when the premises could not have been occupied and used because of unrelated problems. *See Midnight Sessions, Ltd. v. City of Phila.,* 945 F.2d 667, 686 (3d Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992) (Unsuccessful applicants for license to operate dance halls can maintain claim for substantive due process violation upon evidence the government deliberately and arbitrarily abused its power; legitimate state concerns with adequate factual bases are not *per se* arbitrary and unreasonable. If dance hall license denied for lack of compliance with applicable laws and safety regulations, denial is not arbitrary and capricious and cannot state a valid substantive due process claim.). Plaintiffs have not shown that they suffered any actual damages due to the permit delay; they have not established a violation of substantive due process.

### 4. Threatened Eviction from Packer

■ Holt Cargo has continued to operate Packer since entering into the lease with PRPA; Holt Cargo never has been evicted. Tom Holt, Sr., wrote PRPA twice in October, 1994, that Holt Cargo was planning to move cranes from Packer to Gloucester. In response, Holt Cargo was sent a letter by Paul DeMariano of PRPA in October, 1994 stating PRPA believed such an act would violate the terms of the Amended Packer Lease that the cranes would remain at Packer. (Defs.' Appendix at 449). DeMariano also stated that a violation of the lease could result in "the entry of an action and judgment in ejection." (Defs.' Appendix at 450). Holt Cargo claims the threat of ejection had to be revealed to its customers and financiers to its harm.

■ There is no remedy under § 1983 and the Due Process Clause for breach of a contract or lease. *See Linan–Faye Construction Co.,* 49 F.3d at 932; *Vartan,* 980 F.Supp. at 143; *Diamond Flite Ctr.,* 1996 WL 308722, at *3; *Jetstream Aero Servs.,* 672 F.Supp. at 883.

There would be no cause of action if PRPA had actually evicted Holt Cargo in violation of the lease, and there is no remedy for a mere "threat" or attempt to evict Holt Cargo that never went into effect. Instead, the exchange of letters resulted in immediate

negotiations between the parties. (Pltffs.' Brief at 88–105).

Section 1983 does not permit recovery for an attempted constitutional violation; only a claim of actual deprivation is cognizable under the statute. *See Hale v. Townley*, 45 F.3d 914, 920 (5th Cir.1995); *Mozzochi v. Borden*, 959 F.2d 1174, 1180 (2d Cir.1992); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir.1990); *Dooley v. Reiss*, 736 F.2d 1392, 1394–95 (9th Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980); *Ashford v. Skiles*, 837 F.Supp. 108, 115 (E.D.Pa.1993); *Defeo v. Sill*, 810 F.Supp. 648, 658 (E.D.Pa.1993).

██ "[T]he mere attempt to deprive a person of his [constitutional] rights is not, under usual circumstances, actionable under section 1983." *Andree v. Ashland County*, 818 F.2d 1306, 1311 (7th Cir.1987). Even if Holt Cargo did have a constitutional right not to be evicted from Packer, the mere "threat" to deprive it of a constitutional right is not actionable under § 1983. *See Ricketts v. Derello*, 574 F.Supp. 645, 647 (E.D.Pa.1983). "'[M]ere threatening language and gestures of a [state actor] do not, even if true, amount to constitutional violations.'" *Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir.1992) (quoting *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir.), *cert. denied*, 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983)). There is no cause of action under § 1983 for a "threat" to evict Holt Cargo from Packer.

Plaintiffs argue that the "threat" of eviction may have caused lenders and customers to decline to do business with them because of a fear that Holt Cargo might lose Packer. But plaintiffs have not produced evidence of financing lost as a result of this letter, nor have they produced evidence of any lender who raised their interest costs or changed other financing terms. Bernie Gelman, Holt Cargo's CFO, stated that the PRPA letter may have caused him "indigestion," but it did not inhibit any financing. (B. Gelman Dep. at 153–54). Holt Cargo and its counsel informed lenders that this litigation would have no effect Holt Cargo's operations. (*Id.*).

None of the plaintiffs' audited financial statements identified PRPA's letter as a material threat to plaintiffs' business stability. (Defs.' Appendix at 639, 663, 686, 729, 744, 753, 1993–95 Financial Statements, 1996 Guaranty Agreement, 1996 Certificate for Astro Financial Matters, 1996 Camden Improvement Authority Board Opinions).

If unknown lenders or potential customers may have declined to do business with one or more of the plaintiffs because of the warning from PRPA to Holt Cargo that it had to comply with the terms of the Amended Packer Lease or face possible court-ordered eviction, this claim is for future lost business; that is not a violation of due process. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130; *Reichenberger*, 660 F.2d at 282; *Olitsky*, 597 F.2d at 298–99; *Northeast Jet Center II*, 1997 WL 230821, at *9; *Norfolk Fed. of Business Dists.*, 932 F.Supp. at 738; *Hill Aircraft*, 561 F.Supp. at 678; *Raitport*, 451 F.Supp. at 530.

██ As a claim for defamation of plaintiffs' business reputations, "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). To recover for defamatory actions as a violation of due process, a plaintiff must show not only defamation, but also an infringement of a separate, constitutionally protected right. Plaintiffs have no evidence of harm resulting from PRPA's statement in the October, 1994 letter other than a possible loss of future business. The loss of prospective business is not a right cognizable under the Fourteenth Amendment, so plaintiffs cannot recover under § 1983 for any defamatory language. "[D]efamatory publications, however seriously they may have harmed [plaintiffs'] reputation, did not deprive [them] of any 'liberty' or 'property' interests protected by the Due Process Clause." *Paul*, 424 U.S. at 712, 96 S.Ct. 1155.

### 5. Violation of the Amended Packer Lease

██ As evidence of an alleged scheme to deprive plaintiffs of substantive due process,

plaintiffs argue that PRPA failed to fulfill various obligations under the Amended Packer Lease. Assuming PRPA did not adequately dredge certain berths or invest the appropriate amount of capital funds at Packer, there is no constitutional right to be free from breach of a contract or lease by a government agency. *See Linan–Faye Construction Co.*, 49 F.3d at 932; *Vartan*, 980 F.Supp. at 143; *Diamond Flite Ctr.*, 1996 WL 308722, at *3; *Jetstream Aero Servs.*, 672 F.Supp. at 883. Plaintiffs' remedy is an action for breach of the Amended Packer Lease, a claim submitted to the FMC by plaintiffs. Violation of the Amended Packer Lease is not a cognizable constitutional violation under § 1983.

### 6. Advertising

■ Two publications did not adequately identify Packer as a Holt operation or give proper attention to plaintiffs' business interests. The first publication was a brochure entitled "The Ports of Philadelphia and Camden: An Overview of Facilities and Capabilities"; this was jointly produced by PRPA and PPC. (Defs.' Appendix at 528). The brochure did not list every private port business. However, Packer did receive a two page description. (*Id.* at 541–42).

The second publication was a January, 1995 feature in the *Journal of Commerce* concerning the Port of Philadelphia and Camden. Packer was mentioned numerous times. (Defs.' Appendix at 568–70, 575, 578). Holt Cargo's telephone number was listed. Thomas Holt, Sr., was referred to as a leading stevedore in the Port District. Holt Cargo was offered the chance to contribute to the *Journal of Commerce* feature, but declined to do so. (J. McDermott Dep. at 122–23; J. Murphy Dep. at 121).

Plaintiffs claim the publications did not devote sufficient space to them so that potential customers may have been confused about the status of Packer. Plaintiffs have not produced evidence of anyone actually misled by the publications or otherwise confused as a result of the advertisements or actual damage. "Because the injury complained of thus remains speculative, tentative, and hypothetical, this ground for relief also falls short of

establishing the requisite deprivation of a constitutional right to merit § 1983 relief." *Reichenberger*, 660 F.2d at 285.

■ Plaintiffs contend that private port businesses have a constitutional right to be mentioned favorably in every publication produced by a governmental agency. No such right exists. Even if one or more of the plaintiffs might lose a potential customer as a result of these publications, there is no § 1983 remedy for such loss of future, potential business. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130; *Reichenberger*, 660 F.2d at 282; *Olitsky*, 597 F.2d at 298–99; *Northeast Jet Center II*, 1997 WL 230821, at *9; *Norfolk Fed. of Business Dists.*, 932 F.Supp. at 738; *Hill Aircraft*, 561 F.Supp. at 678; *Raitport*, 451 F.Supp. at 530.

■ Plaintiffs criticize the fact that the publications promoted various government-owned facilities without affording private facilities the same attention. But there is no constitutional right to be free from governmental competition. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130; *Northeast Jet Center II*, 1997 WL 230821, at *9; *Norfolk Fed. of Business Dists.*, 932 F.Supp. at 738, 740; *Hill Aircraft*, 561 F.Supp. at 678.

### 7. Pier 82 Lease Bid

■ PRPA did not accept a lease bid for Pier 82 submitted by non-party RDC, but accepted a bid submitted by Penn Trucking instead. Plaintiffs claim PRPA intentionally refused to accept RDC's bid to deny a business opportunity to a Holt entity.

The Pier 82 claim raises a concern of standing. RDC, although affiliated with Thomas Holt, Sr., is not a party to this action. None of the parties submitted a lease bid for Pier 82. Plaintiffs argue that Holt Cargo really was the party in interest on the RDC bid, because RDC submitted the bid on Holt Cargo's behalf. Accepting that allegations as true, Holt Cargo has standing to challenge the Pier 82 bid process.

■ Even if RDC submitted the lowest bid, PRPA was not obligated to award the bid to the lowest bidder under Pennsylvania law. *See* Pa. Stat. Ann. tit. 55, § 697.11.

But even if state law required the lease be awarded to the lowest bidder, and RDC submitted the lowest bid on behalf of Holt Cargo, "the statute bestows no legally enforceable right on a bidder prior to the acceptance of its bid." *Independent Enter.*, 103 F.3d at 1178–79. Holt Cargo had no right to the Pier 82 lease enforceable through § 1983; denial of RDC's bid was not a violation of substantive due process.[7]

### 8. Lost or Diverted Customers

 Plaintiffs' final alleged predatory act[8] underlying their substantive due process claim is that PRPA and non-party SJPC have diverted customers from Holt Cargo and Holt Hauling by offering subsidized rates, free rent and other benefits to competitors to cause economic loss to Holt Cargo and Holt Hauling. Plaintiffs alleged they lost various intermodal customers as a result of PRPA's decision to offer better lease terms to other third-parties. There is no evidence that either PRPA, DRPA nor PPC approached or solicited any intermodal shippers to leave Packer or take their business to plaintiffs' competitors. Holt Cargo's CFO testified that it had to reduce its rates to retain certain customers, such as Blue Star and Columbus Line, to keep them from taking their business to competitor Tioga Container. (W. Curran Dep. at 661–67). But Holt Cargo has no constitutionally recognized right to maximize its profits. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130. Even if Holt Cargo will lose future business because former customers berth with competitors, the loss of future business does not amount to a violation of due process. *See Reichenberger*, 660 F.2d at 282; *Olitsky*, 597 F.2d at 298–99; *Northeast Jet Center II*, 1997 WL 230821, at *9; *Norfolk Fed. of*

*Business Dists.*, 932 F.Supp. at 738; *Hill Aircraft*, 561 F.Supp. at 678; *Raitport*, 451 F.Supp. at 530. Plaintiffs cannot recover for these actions.

 Plaintiffs also express concern that, at some point in the future, one or more of the PRPA, DRPA or PPC may operate their port facilities rather than lease them to private companies. Plaintiffs object to this possible future competition from governmental agencies. Possible future competition from port facilities of the defendants is too speculative for a § 1983 action now, before any such enterprises are formed or operative. *See Reichenberger*, 660 F.2d at 282; *Olitsky*, 597 F.2d at 298–99; *Raitport*, 451 F.Supp. at 530.

Plaintiffs have no constitutional right to be free from governmental competition in the marketplace. *See Hill Aircraft*, 561 F.Supp. at 678. Nor do plaintiffs have the right to be free from governmental action designed to encourage other private development in the Port District. Plaintiffs' seventh alleged predatory act has not alleged a violation of any due process rights.

### C. Arbitrary/Irrational Deprivation or Bad Faith

Plaintiffs have failed to submit evidence of any fundamental property rights protected under the Due Process Clause. Even if they had done so, they would then have to establish that those property rights were deprived in an arbitrary or irrational manner or were based on bad faith before they could recover under § 1983. *See Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 692 (3d Cir.1993); *Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 683 (3d Cir.1991), *cert. denied*, 503

---

**7.** This claim suffers from the additional infirmity that plaintiffs are attempting to allege a due process violation based on the denial of the ability to engage in future business operations on Pier 82, which may have resulted in the loss of potential income. There is no constitutional right to future business. *See National Paint & Coatings Assoc.*, 45 F.3d at 1130; *Reichenberger*, 660 F.2d at 282; *Olitsky*, 597 F.2d at 298–99; *Northeast Jet Center II*, 1997 WL 230821, at *9; *Norfolk Fed. of Business Dists.*, 932 F.Supp. at 738; *Hill Aircraft*, 561 F.Supp. at 678; *Raitport*, 451 F.Supp. at 530.

**8.** Plaintiffs appear to assert two new alleged predatory acts for the first time in their pretrial memorandum, after the close of discovery: 1) DRPA providing $2,500,000 in loans to a joint venture developing the Philadelphia Naval Yard; and 2) lost wharfage fees for the S.S. United States. Neither of these allegations were raised in a timely manner, *see* October 10, 1997 Order; they will not be considered.

U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992).

### 1. Arbitrary/Irrational Deprivation

■■■■ "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see Arlington Heights,* 429 U.S. at 263, 97 S.Ct. 555; *Dent v. West Virginia,* 129 U.S. 114, 123, 9 S.Ct. 231, 32 L.Ed. 623 (1889); *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1034–35 (3d Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2482, 96 L.Ed.2d 375 (1987). Only "the deliberate and arbitrary abuse of government power" runs afoul of the Due Process Clause. *Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988); *see also Independent Enter.,* 103 F.3d at 1179; *Rogers v. Bucks County Domestic Relations Section,* 959 F.2d 1268, 1277 (3d Cir.1992). Whether the government's conduct was irrational or arbitrary is a question of law for the court. *See Parkway Garage,* 5 F.3d at 692; *Austin v. Neal,* 933 F.Supp. 444, 455 (E.D.Pa.1996).

#### a. Pier 96 South

■■■ Holt Cargo has certain lease rights to Pier 96 South as an Additional Parcel under the Amended Packer Lease. PRPA and Pasha entered into a lease for Pier 96 South prior to the date of the Amended Packer Lease between PRPA and Holt Cargo. The Amended Packer Lease expressly states the rights given to Holt Cargo regarding the Additional Parcels were subject to the preexisting rights of Pasha, the current lessee. (Amended Packer Lease at § 24.2(a)(ii) & Ex. K). Plaintiffs claim PRPA is impermissibly allowing Pasha to remain on the site to keep Holt Cargo from taking possession.

Pasha filed a separate action against PRPA, Holt Cargo, Holt Hauling and Astro for a declaratory judgment regarding the terms of the Pasha lease with PRPA. *See* Civil Action No. 96–6779. It was not irrational or arbitrary for PRPA to allow Pasha

to remain on Pier 96 South during the course of litigation to determine construction of the Pasha lease terms. If PRPA evicted Pasha from Pier 96 South to allow Holt Cargo to take possession, PRPA would expose itself to possible liability to Pasha.[9] As a matter of law, it is not arbitrary for PRPA to permit Pasha to remain on Pier 96 South during the pendency of Pasha's declaratory action judgment.

#### b. Publicker

■■ PRPA declined to co-apply with non-party DAE for environmental permits to develop the Publicker site but offered to support DAE's applications. Under Pennsylvania law, DAE did not need PRPA as a co-applicant to obtain the permits; DAE needed PRPA's support, which PRPA offered, as contemplated under the Amended Packer Lease. (Amended Packer Lease ¶ 26).

PRPA had previously enacted resolutions barring the use of any PRPA facility for non-industrial purposes. DAE's plans included construction of a future hotel or cruise ship line. The DAE application described the proposed construction of a "multi purpose marine terminal." PRPA decided not to co-apply for the DAE permits.

Pennsylvania law limited the purpose of PRPA to acquiring "port facilities, port related projects, or parts thereof, and equipment." Pa.Stat.Ann. tit. 55, § 697.6(a). The statute explicitly excluded the acquisition of hotels or recreational or cruise ship operations. *See* Pa.Stat.Ann. tit. 55, § 697.3. It was not irrational for PRPA to decline to co-apply for permits for such development projects to comply with its authorizing statute.

PRPA also feared liability consequences if it were a co-applicant for the Publicker permits because it would have been jointly liable with DAE for maintenance of a bulkhead to be built at Publicker. By supporting DAE's application as a non-applicant, PRPA avoided that liability risk. The desire to avoid potential liability is not irrational or arbitrary.

PRPA was not the governmental agency authorized to issue environmental permits for Publicker development. DAE applied to the Pennsylvania DER and Army Corps of Engi-

**9.** *But see* Amended Packer Lease Arts. XVI, XX.

neers. Those agencies, neither of which is affiliated with any of the defendants, repeatedly refused DAE's applications for so large development immediately adjacent to the Walt Whitman Bridge. The DER and Army Corps of Engineers had numerous concerns about the project unrelated to PRPA's role in co-applying or supporting the applications. PRPA has no responsibility for the concerns and delays occasioned by requirements of the DER and the Army Corps of Engineers.

### c. Threatened Eviction

■ When PRPA learned of Holt Cargo's plans to move cranes from Packer to Gloucester, DeMariano sent a letter to Holt Cargo warning it of possible judicial action and ejectment from Packer, if Holt Cargo were to breach the Amended Packer Lease. Under the terms of the lease, Holt Cargo was prohibited from removing cranes from Packer with certain qualifications and exceptions. (Amended Packer Lease at § 7.3(b)). PRPA ignored an arbitration clause but offered to continue negotiations through the end of December, 1994. The plaintiffs filed this lawsuit instead.

There was nothing arbitrary or irrational in a contracting party sending written notice to the other party that there may be a breach of the lease terms, even if accomplished by a warning of possible future judicial action and ejectment instead of an offer of arbitration or negotiation.

### d. Violation of the Amended Packer Lease

■ Plaintiffs claim PRPA failed to fulfill its obligations under the Amended Packer Lease to complete dredging. This breach of contract claim has been presented to the FMC. Even if breach of a lease term could be deprivation of a property interest, PRPA's action was not arbitrary. It is undisputed that PRPA has provided $22,000,000 in capital funding for Packer since Holt Cargo moved in; this is approximately $6,000,000 more than PRPA was required to spend under the terms of the lease. PRPA has performed dredging in the berths around Packer, including $1,000,000 of dredging since the inception of this lawsuit. PRPA has provided cranes for Packer. Even if PRPA has failed to comply with certain provisions of the lease, it has fulfilled (and in some cases exceeded) the requirements of other provisions. PRPA's actions in regard to the Amended Packer Lease were not arbitrary or irrational as a matter of law.

### e. Advertising

■ Plaintiffs complain of two publications that fail adequately to identify Packer as a Holt Cargo facility. The brochure entitled "The Ports of Philadelphia and Camden: An Overview of Facilities," jointly produced by PRPA and PPC, was designed to highlight various public port facilities. Most private port companies were not featured at all; the Packer site was featured. In a photograph of one of the Packer cranes, Holt Cargo's insignia was visible.

In the second publication, a *Journal of Commerce* feature concerning the Port of Philadelphia and Camden, Packer was mentioned numerous times. Holt Cargo's telephone number was listed. Thomas Holt, Sr., was referred to as a leading stevedore in the Port District. Holt Cargo was offered the chance to contribute to the *Journal of Commerce* feature, but declined to do so.

Plaintiffs assume that, as private port companies, they had a right to be featured in any and all publications produced by governmental agencies. But if private newspapers have the right not to mention private companies when publishing articles in the business section, a governmental agency that produces a publication has the same right to exercise editorial control over its brochures without violating the Constitution. It was not arbitrary for defendants to feature plaintiffs less prominently in the materials than they might have liked.

### f. Pier 82 Lease Bid

■ Plaintiffs claim that PRPA improperly declined to accept the bid for Pier 82 submitted by non-party RDC. PRPA had a legitimate interest in the effective operation of Pier 82. There were material differences between the bids submitted by RDC and Penn Trucking, the company that eventually received the lease. PRPA's bidding instructions stated that facsimile submissions would

not be considered; RDC faxed its proposal to PRPA. RDC did not accept PRPA's insurance requirements, but offered to negotiate them instead. Penn Trucking identified two specific customers; RDC simply stated it was negotiating with potential customers. Penn Trucking had hired Jack Reimer, a specialist in fruit handling, to operate Penn Trucking's fruit cargo facilities. It is not proper for a trial court to decide the successful bidder. RDC's and Penn Trucking's bids contained several material differences; the court cannot say that PRPA's decision to choose Penn Trucking was irrational or arbitrary.

### g. Lost or Diverted Customers

■ The only evidence that plaintiffs have offered regarding lost customers is a double hearsay statement by Walter Curran, a Holt Cargo employee, that he heard from someone at Blue Star and Columbus Line that a port authority employee told those companies to keep their business at Tioga after they had moved to Tioga during a labor strike at Holt Cargo. (W. Curran Dep. at 57–67). In response to a motion for summary judgment, the adverse party is required to submit materials "as would be admissible in evidence." Fed.R.Civ.P. 56(e). The statement by an official of a defendant to Blue Star or Columbus Line might be an admissible statement by a party opponent, but report of it by someone at Blue Star or Columbus Line to Walter Curran does not fall within an exception to the hearsay rule and would be inadmissible. There is no admissible evidence that any official of the defendants diverted customers from Holt Cargo at Packer.

■ Even if one of the defendants encouraged Blue Star and Columbus Line to keep their business at Tioga rather than return to Packer, such action would not be arbitrary or irrational. A governmental port authority has a legitimate interest in seeing that the entire Port District operates effectively, smoothly and competitively. A port authority has a legitimate interest in ensuring that private companies compete with one another to keep costs down, generate greater shipping business and prevent ships from choosing competing ports in Wilmington, Baltimore, Washington, New York or elsewhere. If one or more of the defendants did seek to keep Tioga in business by encouraging former Packer customers to remain at Tioga instead of returning to Packer after its labor strife ended, the court does not find such conduct irrational, arbitrary or unrelated to the legitimate purposes of the port agency. Even if plaintiffs had established a deprivation of a fundamental property right, they have failed to establish any deprivation that was arbitrary or irrational.

### 2. Bad Faith

■ Substantive due process is not "violated whenever a governmental entity deliberately or arbitrarily abuses government power by, for example, taking actions that are motivated by bias, bad faith, or partisan or personal motives unrelated to the merits of the matter before it," but only when a fundamental property right is infringed. *Independent Enter.*, 103 F.3d at 1179 n. 12. Various employees of defendants expressed a desire to drive plaintiffs out of business, but that desire alone is not a due process violation.

■ Showing bad faith is an alternative to showing arbitrary or irrational conduct; plaintiffs still must show an actual deprivation of a fundamental property interest before bad faith even becomes relevant. The *Independent Enterprises* court stated that prior cases "cannot be understood as affording substantive due process protection from every arbitrary and irrational governmental act, but only for those that deprive the plaintiff of a fundamental property right 'implicitly protected by the Constitution.'" *Id.* (quoting *DeBlasio*, 53 F.3d at 599).

■ Plaintiffs have failed to establish the deprivation of any fundamental property right protected by the Fourteenth Amendment, but even if they did establish such a deprivation, they are unable to show that the deprivation was motivated by bad faith. Plaintiffs have evidence the following officials made statements expressing a desire to remove Holt Cargo from Packer or otherwise drive plaintiffs out of business: Paul Drayton

(DRPA's executive director) and Gene McCaffrey from DRPA; Paul DeMariano (PPC's president and executive director), Paul Zelenkofske (PPC board member) and a Mr. Brown from PPC; and Joseph Jacovini (chairman of PRPA's board) and James McDermott (PRPA's executive director) from PRPA.

■■■■■ A governmental agency cannot be liable under § 1983 for the actions of its individual employees. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Blanche Road*, 57 F.3d at 253. Instead, plaintiffs must be able to impute bad faith motives to the DRPA, PRPA and PPC themselves; an improper motive of a governmental employee cannot make an agency liable unless the agency knew of that motive and approved it, or if the decision was made by the final policy-making authority for the agency. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Blanche Road*, 57 F.3d at 263. "[W]hether an individual had final policymaking authority is a question of state law." *Praprotnik*, 485 U.S. at 124, 108 S.Ct. 915 (quoting *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292).

■■■■■ An employee's invidious intent is not imputed to the government agency even if the employee has discretionary authority. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability." *Id.* at 126, 108 S.Ct. 915. The employee's bad motive is not imputed to the agency even if the final policy makers for the agency failed to review the improper decision made by the employee or gave "substantial deference" to that decision. *See id.* at 129, 108 S.Ct. 915. The "mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where ... the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *Id.* at 130, 108 S.Ct. 915; *see also Flickinger v. School Bd. of City of Norfolk*, 799 F.Supp. 586, 593 (E.D.Va.1992) (School board could not be held liable for superintendent's actions unless a majority of the board "knowingly ratified both [the superintendent's] decision and his basis for that decision, assuming that the basis for [the] decision was unconstitutional.").

### a. DRPA

DRPA's board of commissioners is comprised of sixteen members: eight from Pennsylvania and eight from New Jersey. Of the eight Pennsylvania commissioners, six are appointed by the governor for a term of five years. The Pennsylvania Auditor General and Pennsylvania Treasurer serve as *ex officio* commissioners during their terms in office. Of the eight New Jersey commissioners, all are appointed by the governor for a term of five years. *See* Pa.Stat.Ann. tit. 36, § 3503.

Under the statute establishing DRPA, policy decisions are not binding on DRPA "unless a majority of the members of the commission from Pennsylvania and a majority of the members of the commission from New Jersey shall vote in favor thereof." *Id.* In addition, even if a majority of both states' commissioners approve a policy, "each State reserves the right to provide by law for the exercise of a veto power by the Governor of that State over any action of any commissioner from that State." *Id.* New Jersey has also enacted such legislation. *See* N.J. Stat. Ann. 32:3–4a.

Plaintiffs have offered evidence that Paul Drayton and Gene McCaffrey made statements evidencing a desire to see plaintiffs removed from the Port District. Under the operating statute of DRPA, a policy statement by Drayton or McCaffrey to remove plaintiffs from the Port District would have to be known and approved by a majority of both Pennsylvania's and New Jersey's commissioners and survive a possible veto by New Jersey's governor. Plaintiffs have only alleged that two DRPA individuals expressed such a desire. Even if both were voting commissioners, they did not constitute a majority of the DRPA board. Tom Holt, Sr., admitted that New Jersey's governor did not share any desire to drive plaintiffs out of business. (T. Holt, Sr. Dep. at 130–31).

In order to impute the improper motives of two individuals to the DRPA board, plaintiffs must be able to show that a majority of the board knew of the improper motive and ratified it. *See Praprotnik,* 485 U.S. at 123, 108 S.Ct. 915; *Pembaur,* 475 U.S. at 480, 106 S.Ct. 1292; *Blanche Road,* 57 F.3d at 263. Two votes plainly could not carry a majority of DRPA's board and approve a policy to remove plaintiffs from the port.

■ Generally, a plaintiff trying to impute an improper motive from a government official to the agency itself must show that a majority of the applicable board members knew of the plan and approved it; a minority of the board members is insufficient to graft the motive onto the board. *See Scott–Harris v. City of Fall River,* 134 F.3d 427, (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998); *Church v. City of Huntsville,* 30 F.3d 1332, 1343–44 & n. 5 (11th Cir.1994); *see also Blanche Road,* 57 F.3d at 260 (evidence that all three members of Board of Supervisors harbored bad faith motive). In the area of race or gender discrimination, one court has relaxed the standard to permit recovery if such considerations "were a motivating factor among a significant percentage of those who were responsible" for the agency's decision. *See United States v. City of Birmingham,* 538 F.Supp. 819 (E.D.Mich.1982), *aff'd,* 727 F.2d 560 (6th Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

In *Church,* several homeless individuals, alleged the city adopted a policy of harassing them to drive them from the city. The plaintiffs based their § 1983 claim on statements of one member of the five-member city council. The court noted that a single city councilor did not have the power to establish policy or bind the city. *See Church,* 30 F.3d at 1343–44. Of the remaining four members of the council, two voted against the policy and the other two had expressed no views on the desirability of excluding homeless people.

The court would not draw an inference of discriminatory intent from the silence of those two members of the council and held the city was not liable. *See id.* at 1344 n. 5.

In *Scott–Harris,* Scott–Harris sued the City of Fall River, Mayor Daniel Bogan ("Bogan") and Marilyn Roderick ("Roderick"), vice-president of the city council. Scott–Harris argued the city council voted to eliminate her position with discriminatory animus; the defendants asserted they did so for budgetary concerns in order to erase a widening deficit. Under the city charter, the decision had to be approved by a majority of the nine-member city council and signed into law by the mayor. The city council voted eight to two in favor of eliminating the position; Roderick voted with the majority, and Bogan signed the ordinance. *See Scott–Harris,* 134 F.3d at 430–31.

The jury found the city and both officials liable under § 1983. The city appealed on the ground that it could not be liable for the city council's decision to eliminate the Scott–Harris position when only two of the ten city officials involved in the decision (nine-member city council plus the mayor) harbored a discriminatory motive for doing so. *See id.* at 436–40. Roderick and Bogan appealed on the basis that they had immunity for their legislative conduct. *See id.* at 440–44.

The court of appeals determined that evidence that a minority of the board members operated in bad faith was insufficient to hold the city liable unless the plaintiff had evidence of: 1) "bad motive on the part of at least a significant bloc of legislators;" or 2) "circumstances suggesting the probable complicity of others." *Id.*[10]

Plaintiffs have evidence that two DRPA individuals expressed a desire to remove plaintiffs from the port. Even if both were voting commissioners, they did not constitute the majority of the DRPA board required to impute their motives to DRPA itself. *See*

**10.** On the appeal by the two individual officials, the court held that they were not entitled to legislative immunity. *See id.* at 441. The two individuals and the city separately sought review in the Supreme Court. The Court, granting certiorari on the appeal by the individuals, held they were absolutely immune for their actions be-

cause the enactment of a city ordinance and the signing of that ordinance by the mayor were legislative acts. *See Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 973, 140 L.Ed.2d 79 (1998); *Scott–Harris v. City of Fall River,* —— U.S. ——, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998).

*Scott–Harris,* 134 F.3d at 438; *Church,* 30 F.3d at 1343–44. There is no evidence that any other commissioners, who come from two separate states and are appointed by a total of four separate political officers, harbored a unified intent to drive plaintiffs out of business; two individuals also do not constitute a "significant bloc" of a sixteen-member board. *See Scott–Harris,* 134 F.3d at 438. The motives expressed by Drayton and McCaffrey are not imputed to DRPA.

#### b. PRPA

PRPA's governing board consists of eleven members; they are appointed as follows: four by Pennsylvania's governor; three others by the governor after nomination by the mayor of Philadelphia and the respective leaders of Delaware and Bucks Counties; one by the Speaker of the House of Representatives; one by the President of the Senate; and the remaining two by the minority leaders of the House of Representatives and Senate. *See* Joint Stipulation of Facts.

Under the enabling statute, policy initiatives undertaken by the PRPA must be approved by a majority of the PRPA board. *See* Pa.Stat.Ann. tit. 55, § 697.5(g). No one but the board, acting through its majority, can formulate policy for PRPA. Plaintiffs have presented evidence that Joseph Jacovini (chairman of PRPA's board) and James McDermott (PRPA's executive director) harbored ill will toward plaintiffs.

Plaintiffs have only shown that two PRPA officials (one of whom is not a voting member of PRPA's board) evinced a desire to drive plaintiffs from the Port District. Even assuming both had voting privileges, those two individuals did not have the authority to bind PRPA to a policy of driving plaintiffs out of business. Their illicit intent cannot be shifted to PRPA. *See Scott–Harris,* 134 F.3d at 438; *Church,* 30 F.3d at 1343–44. They do not constitute a "significant bloc" of the eleven-member board, and there is no evidence that the rest of the board, appointed by a variety of distinct politicians and serving different interests, possessed a similar motive. *See Scott–Harris,* 134 F.3d at 438. Failure to review a subordinate's decision or "substantial deference" to a subordinate's decision does not create liability for PRPA. *See*

*Praprotnik,* 485 U.S. at 129, 108 S.Ct. 915. There is no evidence establishing PRPA had an invidious motive in acting the way it did.

#### c. PPC

PPC's board consists of eighteen members, nine from Pennsylvania and nine from New Jersey. The nine Pennsylvania members are appointed as follows: three by Pennsylvania's governor for a term of four years; one by the President of the Senate for as long as the President is in office; one by the Senate minority leader for as long as the leader is in office; one by the Speaker of the House of Representatives for as long as the Speaker is in office; one by the House minority leader for as long as the leader is in office; one from a list of three names submitted by the mayor of Philadelphia; and one who currently is a Pennsylvania DRPA commissioner. The nine New Jersey members are appointed by New Jersey's governor from various counties. *See* PPC By–Laws.

All policy is set by PPC's board and must be approved by a "Special Member Majority." That requires that ten members vote in favor of the proposition: five New Jersey directors plus three Pennsylvania directors appointed by the state legislature and two Pennsylvania directors appointed by the governor. Any action or intent of a subordinate cannot be attributed to the board unless such a majority knew of the action and approved of it. *See Praprotnik,* 485 U.S. at 129, 108 S.Ct. 915. Plaintiffs have alleged that Paul DeMariano (PPC's president and executive director), Paul Zelenkofske (PPC board member) and a Mr. Brown desired that plaintiffs go out of business. These three individuals are far short of the necessary majority required to set PPC policy. *See Scott–Harris,* 134 F.3d at 438; *Church,* 30 F.3d at 1343–44. They also cannot qualify as a "significant bloc" of PPC's eighteen-member board and there is no evidence that other board members possessed any such intent. *See Scott–Harris,* 134 F.3d at 438. Any impermissible intent by DeMariano, Zelenkofske and Brown cannot be imputed to PPC.

Even if plaintiffs had shown deprivation of a protected property right, they have no

evidence of any impermissible motive attributable to DRPA, PRPA or PPC. Therefore, plaintiffs cannot recover under § 1983 and the Due Process Clause. Summary judgment will be granted on plaintiffs' substantive due process claim.

## VII. Conspiracy

Plaintiffs intend to prove a general conspiracy among the three defendants and various non-parties such as SJPC to deprive plaintiffs of their constitutional rights. "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." *Dixon* 898 F.2d at 1449 n. 6; *see Landrigan v. City of Warwick,* 628 F.2d 736, 742 (1st Cir.1980); *Ryland v. Shapiro,* 708 F.2d 967, 974 (5th Cir. 1983).

" 'Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises....' " *Andree,* 818 F.2d at 1311 (quoting *Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982)); *see, e.g., City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (Municipality only liable when its employee caused actual constitutional injury to plaintiff.).

"While the existence of a conspiracy otherwise may supply the element of state action and expand the scope of liability through the concept of imputation, § 1983 does not provide a cause of action *per se* for conspiracy to deprive one of a constitutional right. Without an actual deprivation, there can be no liability under § 1983." *Defeo,* 810 F.Supp. at 658; *see Mody v. City of Hoboken,* 959 F.2d 461, 466 (3d Cir.1992); *Gladden v. Kemper,* No. 94-1876, 1997 WL 438844, at *7 (E.D.Pa. July 30, 1997); *Ashford,* 837 F.Supp. at 115.

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act, but 'a conspiracy claim is not actionable without an actual violation of section 1983.' " *Hale v. Townley,* 45 F.3d 914, 920 (5th Cir.1995) (citation omitted); *see Thompson v. City of Lawrence,* 58 F.3d 1511, 1517 (10th Cir.1995); *Dixon,* 898 F.2d at 1449; *Kaplan v. Clear Lake City Water Auth.,* 794 F.2d 1059, 1065 (5th Cir.1986); *Dooley v. Reiss,* 736 F.2d 1392, 1395 (9th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Gladden,* 1997 WL 438844, at *7. This is because the "gist of the cause of action is the deprivation and not the conspiracy." *Lesser v. Braniff Airways, Inc.,* 518 F.2d 538, 540 n. 2 (7th Cir.1975); *see Brawer v. Horowitz,* 535 F.2d 830, 839 (3d Cir.1976) ("[Section] 1985 proscribes conspiracies, while § 1983 provides a civil remedy for specific acts of constitutional deprivation.")

Because plaintiffs have failed to establish any actual violation of their equal protection or substantive due process rights, they cannot maintain a cause of action for conspiracy under § 1983. Summary judgment will be granted on the conspiracy claim.

### *CONCLUSION*

Plaintiffs have submitted voluminous documents with their response to defendants' motions for summary judgment. There are questions of fact whether or not various individual officials made statements reflecting a desire to remove plaintiffs from the Port District, but even if those statements were made they are insufficient to impose liability for the defendants. On the equal protection count, even if plaintiffs are similarly situated to the identified competitors, plaintiffs have failed to show that they were treated differently in any material manner; even if they were treated differently, defendants did not act arbitrarily or unreasonably in doing so.

On plaintiffs' substantive due process count, plaintiffs have failed to establish that they were deprived of any "fundamental property right" protected by the Due Process Clause. Even if they were deprived of a protected property interest, they have not shown that defendants acted in an arbitrary or irrational manner. Plaintiffs have not established that any deprivation of a protected property right was based on an invidious motive attributable to DRPA, PRPA or PPC.

Plaintiffs also cannot maintain an action for general conspiracy under 42 U.S.C. § 1983.

An appropriate Order follows.

### ORDER

AND NOW, this 23d day of March, 1998, upon consideration of defendants' motion for summary judgment on plaintiffs' equal protection claim, defendants' motion for summary judgment on plaintiffs' substantive due process claim, plaintiffs' response thereto, after a hearing in an which counsel for all parties were heard, and in an accordance with the attached Memorandum, it is hereby **ORDERED** that:

1. Defendants' motion for summary judgment on plaintiffs' equal protection claim is **GRANTED.** Judgment is **ENTERED** in an favor of defendants on plaintiffs' equal protection claim.

2. Defendants' motion for summary judgment on plaintiffs' substantive due process claim is **GRANTED.** Judgment is **ENTERED** in an favor of defendants on plaintiffs' substantive due process claim.

3. The Clerk of Court is directed to mark this action **CLOSED.**